**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
David M. Bass, Esq.
dbass@coleschotz.com
Felice R. Yudkin, Esq.
fyudkin@coleschotz.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| MODELL'S SPORTING GOODS, INC., *et al.,* | Case No. 20-14179 (VFP) |
| Debtors.[1] | Joint Administration Requested |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO ASSUME THE CONSULTING AGREEMENT,**
**(II) APPROVING PROCEDURES FOR STORE CLOSING SALES, AND**
**(III) APPROVING THE IMPLEMENTATION OF CUSTOMARY STORE BONUS**
**PROGRAM AND PAYMENTS TO NON-INSIDERS THEREUNDER**

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Modell's Sporting Goods, Inc. (9418), Modell's II, Inc. (9422), Modell's NY II, Inc. (9434), Modell's NJ II, Inc. (9438), Modell's PA II, Inc. (9426), Modell's Maryland II, Inc. (9437), Modell's VA II, Inc. (9428), Modell's DE II, Inc. (9423), Modell's DC II, Inc. (9417), Modell's CT II, Inc. (7556), MSG Licensing, Inc. (8971), Modell's NH, Inc. (4219), Modell's Massachusetts, Inc. (6965) and Modell's Online, Inc. (2893). The Debtors' corporate headquarters is located at 498 Seventh Avenue, 20th Floor, New York, New York 10018.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Modell's Sporting Goods, Inc. and its subsidiaries, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as

follows:

## I.    JURISDICTION

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§

157(a)-(b) and 1334(b) the *Standing Order of Reference to the Bankruptcy Court Under Title 11*

of the United States District Court for the District of New Jersey, dated September 18, 2012

(Simandle, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105, 363, 365,

and 554 of the title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy**

**Code**") and Rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure.

## II.    BACKGROUND

3.    On the date hereof (the "**Petition Date**"), each of the Debtors commenced with

this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to

operate their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of

creditors has been appointed in these chapter 11 cases.

4.    Contemporaneously herewith, the Debtors have filed a motion requesting joint

administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

5.    Information regarding the Debtors' business, capital structure, and the

circumstances leading to the commencement of these chapter 11 cases is set forth in the

*Declaration of Robert J. Duffy in Support of Debtors' Chapter11 Petitions and First Day Pleadings*, sworn to on the date hereof (the "**First Day Declaration**"), which has been filed with the Court contemporaneously herewith.[2]

### III.    THE SALES AND STORE CLOSINGS

6.    Before the Petition Date, the Debtors' management, with the assistance of their advisors, performed an extensive analysis of the Debtors' financial performance to identify areas for improvement.  The financial analysis included a comprehensive review of the performance of each of the Debtors' store and the markets in which the Debtors operate.  As a result of this analysis, the Debtors determined, in their business judgment, that it was in the best interests of their estates, creditors, and all parties-in-interest for them to liquidate their assets.  Specifically, the Debtors determined to close all 134 of their retail stores along with their distribution center and e-commerce site (collectively, the "**Stores**").  The Debtors and their advisors have made the decision to seek authority to close and wind down or conduct other similar themed sales ("**Store Closings**") at the Stores, with such sales to be free and clear of all liens, claims, and encumbrances (the "**Sales**").

7.    To maximize the value of the property of the Debtors' estates that is attributable to the Store Closings, the Debtors explored the possibility of hiring a consultant to conduct the Sales and Store Closings.  Ultimately, the Debtors solicited a proposal from Tiger Capital Group, LLC (the "**Consultant**") because it is familiar with the Debtors' inventory having completed an appraisal of same in August of 2019.  Moreover, the Consultant completed a revised appraisal of the Debtors' inventory in early March of 2020.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

55008/0002-19576748v2

8.      After extensive, arm's-length negotiations, the Debtors entered into that certain

Consulting Agreement for Store Closing Program dated February 14, 2020 (as amended,

modified, and supplemented from time-to-time, the "**Consulting Agreement**"), by and between

Modell's Sporting Goods, Inc. and the Consultant.  A copy of the Consulting Agreement is

annexed as Exhibit 1 to the Interim Order (defined below).  On March 10, 2020, the Consulting

Agreement was modified by that certain First Addendum to Consulting Agreement, also attached

as Exhibit 1 to the Interim Order.

9.      Pursuant to the Consulting Agreement, the Consultant will serve as the exclusive

agent to the Debtors in connection with the Sales and Store Closings.  More specifically, the

Consultant has been engaged to: (a) manage the Sales and Store Closings; (b) sell all goods,

saleable in the ordinary course, located in the Stores as of the Sale Commencement Date (as

defined in the Consulting Agreement) or subsequently delivered to the Stores after the Sale

Commencement Date (collectively, the "**Merchandise**"), (c) sell owned furnishings, trade

fixtures, equipment and improvements to real property that are located in the Stores and the

corporate offices (other than Retained FF&E as defined in the Consulting Agreement)

(collectively, the "**FF&E**"), and the Additional Consultant Goods (as defined in the Consulting

Agreement, and together with the FF&E and the Merchandise, the "**Store Closure Assets**"); and

(c) otherwise prepare the Stores for turnover to the applicable landlords on the terms set forth in

the Consulting Agreement.

10.      The Consultant commenced Sales at certain of the Stores on February 21, 2020.

**A.      The Consulting Agreement**

11.      A summary of the salient terms of the Consulting Agreement is set forth below.[3]

---

[3] The following summary chart is for the convenience of the Bankruptcy Court and parties-in-interest. To
the extent there is any conflict between this summary and the Consulting Agreement, the Consulting Agreement

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Services Provided By Consultant** | • Recommend appropriate discounting to effectively sell all of the Debtors' goods located at or to be delivered to the Stores, in accordance with a "store closing" or other mutually agreed upon themed sale, and recommend appropriate point-of-purchase, point of sale, and other internal and external advertising in connection therewith;<br>• Provide qualified supervision to oversee the conduct of the Sale;<br>• Maintain focused and constant communication with store-level employees and managers to keep them abreast of strategy and timing and to properly effect store-level communication by the Debtors' employees to customers and others about the Sales;<br>• Establish and monitor accounting functions for the Sales, including evaluation of sales of the Debtors' goods located at the Stores by category, sales reporting, and expense monitoring;<br>• Meet with the Debtors, on at least a weekly basis, to review sales, sales reporting and expenses in an effort to minimize expenses and maximize overall net recovery of the Sales;<br>• Recommend loss prevention strategies;<br>• Coordinate with the Debtors so that the Stores are properly maintained including ongoing customer service and housekeeping activities;<br>• Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs (to be funded by the Debtors) for Store employees;<br>• Advise the Debtors with respect to the permitting requirements of affecting the Sales as a "store closing" sale or other mutually agreed-upon theme in compliance with applicable state and local "going out of business" laws, and, after the commencement of a chapter 11 case before any United States Bankruptcy Court, in compliance with any Court Order. In connection with such obligation, to the extent applicable and requested by the Debtors prior to any bankruptcy  case, the Consultant will (i) advise the Debtors of any permitting requirements, (ii) prepare (in the Debtors' name and for the Debtors' signatures) all permitting paperwork as may  be required, deliver all such paperwork to the Debtors, and file, on behalf of the Debtors, all such paperwork where necessary and/or (iii) advise where permitting paperwork and/or waiting periods do not apply; and<br>• Assist the Debtors in a program to protect the Debtors' brand during the Sales. |
| **Term of Sale** | • The "Sale Term" with respect to each Store shall commence on a date to be mutually agreed and shall end on the date determined by the Debtors, in reasonable consultation with the Consultant, but in no event later than 90 days thereafter; provided, however, that Consultant and the Debtors may mutually agree upon earlier or dates with respect to any one or more Stores (on a store-by-store basis).  To the extent practicable, the Debtors shall give the Consultant no less than 7 calendar days' notice of the Sale Termination Date; provided, however, when circumstances dictate an earlier Sale Termination Date, the Debtors shall suffer no penalty as a result such earlier termination. |

shall govern in all respects. Capitalized terms used but not defined in this summary shall have the meanings ascribed to them in the Consulting Agreement.

5

| TERM | CONSULTING AGREEMENT |
|---|---|
| **Expenses of Consultant** | • All expenses incident to the conduct of the Sale and the operation of the Stores during the Term (including without limitation all Consultant Controlled Expenses and all other Store-level and corporate expenses associated with the Sale) shall be as determined by the Debtors, after consultation with Consultant as set forth on Exhibit B to the Consulting Agreement, and borne by the Debtors; except solely for any of the specifically enumerated "Consultant Controlled Expenses" that exceed the budgeted amount for all Consultant Controlled Expenses shown on Exhibit B to the Consulting Agreement.<br>• Exhibit B to the Consulting Agreement consists of an expense budget for the "Consultant Controlled Expenses" (including for Sale-related supervision, advertising, administrative, and miscellaneous expenses) to be incurred during the Sale Term. The expense budget may only be modified by mutual agreement of the parties.<br>• The Consultant will advance funds for the Consultant's Controlled Expenses and the Debtors shall reimburse Consultant therefor (up to the aggregate budgeted amount by week and on a line item basis) in connection with each weekly reconciliation contemplated by Section 5(b) upon presentation of reasonable documentation for such actually-incurred expenses. The parties may from time-to-time mutually agree in writing to increase or decrease the budget of Consultant Controlled Expenses based upon circumstances of the Sale, but any such change must be in writing. To the extent the parties determine to include the e-commerce site in the Sale, the e-commerce site will be treated like a Store under the Consulting Agreement.<br>• In the event of a Bankruptcy Case, all reimbursement of expenses to Consultant shall. pursuant to Court Order, be (i) authorized without further Court Order free and clear of all liens, claims and encumbrances and (ii) approved to be made on a weekly basis without further Court Order and otherwise in accordance with the Consulting Agreement, |

| Compensation for Consultant | • In consideration of providing the Consulting Services hereunder, the Debtors shall pay the Consultant a "Base Fee" equal to one percent (1%) of the Gross Proceeds derived from the Sale.  In addition, the Consultant may earn an additional incentive fee (the "Incentive Fee") based upon the following thresholds of Gross Recovery Percentage calculated back to the first dollar received: |
|---|---|

| Gross Recovery Percentage | Incentive Fee |
|---|---|
| Between 120.0 % to 125.0% | 1.50% of Gross Proceeds |
| Between 125.01 % to 130.0% | 2.00% of Gross Proceeds |
| Between 130.01% to 135.0% | 2.25% of Gross Proceeds |
| Above 135.01 % | 2.50% of Gross Proceeds |

| | For the avoidance of doubt, the above Incentive Fees, if achieved, are in lieu of the Base Fee.<br><br>• In the event of a Bankruptcy Case, all fees payable to the Consultant shall. pursuant to Court Order, be (i) authorized without further Court Order free and clear of all liens, claims and encumbrances and (ii) approved to be made on a weekly basis without further Court Order and otherwise in accordance with the Consulting Agreement, |
|---|---|
| Insurance Obligations | • During the Sale Term: (a) the Debtors shall maintain (at their expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with the Debtors' ordinary course operations, and (b) the Debtors and the Consultant shall maintain (at each party's respective expense) comprehensive auto liability for owned and non-owned autos and general liability insurance covering injuries to persons and property in or in connection with the Stores, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage.  Each party shall be added as an additional insured on all such insurance of the other party, all such insurance shall provide that it shall be non-cancelable and non-changeable except after 30 days' prior written notice to the other Party, and each Party shall provide the other with certificates of all such insurance prior to the commencement of the Term.<br>• Notwithstanding any other provision of the Consulting Agreement, and except as set forth in Section 9 thereof, the Debtors and the Consultant agree that the Debtors shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees, and other persons arising from events occurring at the Stores, and Merchandise sold in the Stores, before, during, and after the Term, except to the extent any such claim arises from the negligence, willful misconduct, or unlawful acts of the Consultant. |
| Indemnification by Consultant | • The Consultant shall indemnify and hold the Debtors and their affiliates, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "**Debtor Indemnified Parties**") harmless from and against all third-party claims, demands,  penalties, losses, liabilities, and damages, including, without limitation, reasonable  and  documented attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: |

7

|  | <ul><li>the Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;</li><li>any harassment or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of the Debtors by the Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors, or representatives (including without limitation any supervisors);</li><li>any claims by any party engaged by the Consultant as an employee or independent contractor (including without limitation any non-Debtor employee supervisor) arising out of such employment or engagement; or</li><li>the negligence, willful misconduct, or unlawful acts of the Consultant, its affiliates or their respective officers, directors, employees, Consultants, independent contractors, or representatives, provided that the Consultant shall not be obligated to indemnify any Debtor Indemnified Party from or against any claims, demands, penalties, losses, liabilities or damages arising primarily from any Debtor Indemnified Party's gross negligence, willful misconduct, or unlawful act.</li></ul> |
|---|---|
| **Indemnification by the Debtors** | <ul><li>The Debtors shall indemnify and hold the Consultant, its affiliates and their respective officers, directors, employees, consultants, and independent contractors (collectively, "**Consultant Indemnified Parties**") harmless from and against all third-party claims, demands, penalties, losses, liabilities and damages, including, without limitation, reasonable and documented attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:</li><ul><li>the Debtors' material breach of or failure to comply with any of its agreements, covenants, representations, or warranties contained herein or in any written agreement entered into in connection herewith;</li><li>any claims by any party engaged by the Debtors as an employee or independent contractor arising out of such engagement, except where due to the negligence, willful misconduct, or unlawful acts of the Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives;</li><li>any consumer warranty or products liability claims relating to any Merchandise; and/or</li><li>the negligence, willful misconduct or unlawful acts of the Debtors, their affiliates or their respective officers, directors, employees, agents, independent contractors or representatives, provided that the Debtors shall not be obligated to indemnify any Consultant Indemnified Party from or against any claims, demands, penalties, losses, liabilities, or damages arising primarily from any Consultant Indemnified Party's gross negligence, willful misconduct, or unlawful act.</li></ul></ul> |
| **Additional Consultant Goods** | <ul><li>In connection with the Sale, subject to compliance with applicable law and any Approval Order, Consultant shall have the right if mutually agreeable by the Debtors, at Consultant's sole cost and expense to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind and no lesser quality to the Merchandise in the Sale ("Additional Consultant Goods" ). The Additional Consultant Goods shall be purchased by Consultant as part of the Sale, and delivered to the Stores at Consultant's sole expense (including labor, freight, and insurance relative to shipping such Additional</li></ul> |

Consultant Goods to the Stores). Sales of Additional Consultant Goods shall be run through the Debtors' cash register systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise. Consultant and the Debtors shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Debtor goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale. In any sale of Additional Consultant Goods as described above, it shall be the responsibility of the Consultant to ensure that such sale is implemented in accordance with the terms of this Agreement.

12.     By this motion, the Debtors seek to assume the Consulting Agreement so that the Consultant may continue in its role as Consultant for the Sales and the Store Closings on a post-petition basis without interruption. The Debtors have determined, in the exercise of their business judgment, that (a) the continuation of services by the Consultant is necessary for efficient large-scale execution of the Sales and Store Closings, to maximize the value of the Store Closure Assets, and to continue the Sales and the Store Closings in a timely manner and (b) any change in or elimination of the engagement with the Consultant would significantly disrupt the Sale process and impair the value of the remaining Store Closure Assets.  The Debtors believe that assuming the Consulting Agreement will allow the Debtors to continue to utilize the logistical capabilities, experience, and resources of the Consultant in performing the Sales and Store Closings in a format that allows the Debtors to retain control over the Sales and Store Closings.  Moreover, assumption of the Consulting Agreement, as contemplated by this motion, will establish fair and uniform store closing procedures.

**B.     The Store Closing Procedures**

13.     The Debtors seek approval of streamlined Store Closing Procedures, as described in Exhibit 2 to the Interim Order, to sell the Store Closure Assets, in each case through a Sale

free and clear of liens, claims, and encumbrances. The Debtors also seek approval of the Store

Closing Procedures to provide newspapers and other advertising media in which the Sales may

be advertised with comfort that the Debtors are conducting the Sales in compliance with

applicable law and with the Bankruptcy Court's approval. The Debtors seek interim approval of

the Store Closing Procedures in light of the need to continue the Sales and Store Closings in an

efficient and timely manner.

14.     The Debtors have determined, in the exercise of their business judgment and in

consultation with their advisors, that the Store Closing Procedures will provide the best, most

efficient, and most organized means of selling the Store Closure Assets to maximize their value

to the estates.

**C.      Liquidation Sale Laws and Dispute Resolution Procedures**

15.     Certain states in which the Debtors operate stores have, or may have, licensing or

other requirements governing the conduct of store closing, liquidation, or other inventory

clearance sales, including, without limitation, federal, state, and local laws, statutes, rules,

regulations, and ordinances (collectively, the "**Liquidation Sale Laws**"). Liquidation Sale Laws

may include licensing, permitting, or bonding requirements, waiting periods, time limits, bulk

sale restrictions, and augmentation limitations that would otherwise apply to the Store Closings.

Such requirements would hamper the Debtors' ability to maximize value in selling their

inventory. Accordingly, subject to the Bankruptcy Court's approval, the Debtors intend to

conduct the Store Closings in accordance with the Store Closing Procedures.  To the extent the

Store Closing Procedures conflict with the Liquidation Sale Laws, the Store Closing Procedures

will control.

16.     To facilitate the orderly resolution of any disputes between the Debtors and any

Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the

Store Closing Procedures and the alleged applicability of any Liquidation Sale Laws, the

Debtors respectfully request that the Bankruptcy Court authorize the Debtors to implement the

following dispute resolution procedures (the "**Dispute Resolution Procedures**"), on an interim

and final basis:

(a)    Provided that the Sales are conducted in accordance with the terms of the Interim Order or the Final Order (each as defined below), as applicable, and the Store Closing Procedures, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, the Debtors and the Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of the Interim Order and/or the Final Order, as applicable, and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws.

(b)    Within five business days of the entry of the Interim Order, the Debtors will serve by email, facsimile, or first-class mail, copies of the Interim Order, the proposed Final Order, the Consulting Agreement, and the Store Closing Procedures on the following: (i) the landlords for the Stores; (ii) the Attorney General's office for each state in which the Sales are being held; (iii) the county consumer protection agency or similar agency for each county in which the Sales are being held; (iv) the division of consumer protection for each state in which the Sales are being held; (v) the chief legal counsel for each local jurisdiction in which the Sales are being held (collectively, the "**Dispute Notice Parties**").

(c)    To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, or the proposed Final Order, as applicable, the Consulting Agreement, or the Store Closing Procedures, which dispute relates to any Liquidation Sale Laws (a "**Reserved Dispute**"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve such Reserved Dispute. Any time within ten days following entry of the Interim Order any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "**Dispute Notice**") explaining the nature of the dispute to: (i) proposed counsel to the Debtors, Cole Schotz P.C., 25 Main Street, Hackensack, New Jersey 07601, Attn: Michael D. Sirota, Esq., David M. Bass, Esq. and Felice R. Yudkin, Esq; (ii) the Consultant, 99 Park Avenue, 19th Floor, New York, NY 10016, Attn: Mark P. Naughton, Esq. and 60 State Street, 11th Floor, Boston, Massachusetts 02109, Attn: Michael McGrail, with a copy to Maura I. Russell, Esq., Montgomery McCracken Walker & Rhoads LLP, 437 Madison Avenue, 24th Floor, New York, NY 10022; (iii) counsel for the administrative agent under the Debtors' pre-petition revolving credit facility, JPMorgan

Chase Bank, N.A., c/o Daniel F. Fiorillo, Esq. and Chad B. Simon, Esq., Otterbourg P.C.; and (iv) counsel for the term agent under the Debtors' pre-petition term loan, Wells Fargo Bank, National Association, c/o Steven E. Fox, Esq., Riemer & Braunstein LLP.  If the Debtors, the Consultant, and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Bankruptcy Court requesting that the Court resolve the Reserved Dispute (a "**Dispute Resolution Motion**").

(d)    In the event that a Dispute Resolution Motion is filed, nothing in the Interim Order or the Final Order, as applicable, shall preclude the Debtors, a landlord, the Consultant or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code or (ii) that neither the terms of the Interim Order or the Final Order, as applicable, nor the conduct of the Debtors or the Consultant pursuant to the Interim Order or the Final Order, as applicable, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Order or the Final Order or to limit or interfere with the Debtors' or the Consultant's ability to conduct or to continue to conduct the Sales pursuant to the Interim Order or the Final Order, absent further order of the Court. Upon the entry of the Interim Order or the Final Order, as applicable, the Court grants authority for the Debtors and the Consultant to conduct the Sales pursuant to the terms of the Interim Order or the Final Order, as applicable, the Consulting Agreement, and/or the Store Closing Procedures and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order or the Final Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(e)    If, at any time, a dispute arises between the Debtors and/or the Consultant and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Order or the Final Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (c) and (d) above by serving a notice to the applicable parties and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

55008/0002-19576748v2

D.     **Fast Pay Laws**

17.     Many states in which the Debtors operate have laws and regulations that require

the Debtors to pay an employee substantially contemporaneously with his or her termination (the

"**Fast Pay Laws**" and, together with the Liquidation Sale Laws, the "**Liquidation Sale Laws**").

These laws often require payment to occur immediately or within a period of only a few days

from the date such employee is terminated.

18.     The nature of the Store Closings contemplated by this motion will result in all of

the employees being terminated at or near the end of the Store Closings. To be clear, the Debtors

intend to pay their terminated employees as expeditiously as possible under normal payment

procedures and pursuant to applicable Bankruptcy Court order.[4] However, the Debtors' payroll

systems may be unable to process the payroll information associated with the large number of

terminations anticipated in a manner that will be compliant with the Fast Pay Laws. Under

ordinary circumstances, the Debtors' payroll department is able to coordinate delivery of final

checks to coincide with an employee's final day of work where required by state law. This

process requires the Debtors' payroll department to calculate individual termination payments,

prepare each termination payment check, obtain authorization for each such check, and then

prepare each such check for mailing. Given the number of employees who will be terminated in

connection with the Store Closings, this process could take several days, making compliance with

the Fast Pay Laws burdensome to the Debtors' estates, if not impossible. Accordingly, the

Debtors request exemption from the Fast Pay Laws.

---

[4] The Debtors are seeking such relief pursuant to the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363, and 507(a) for Interim and Final Authority to (I) Pay Certain Pre-Petition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefits Programs, and for Related Relief,* filed contemporaneously herewith.

13

E.    **Lease Restrictions**

19.    The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent the Debtors from maximizing value for creditors through the Sales and Store Closings. In certain cases, the contemplated Sales and Store Closings may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including, without limitation, reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions. Such restrictions would hamper the Debtors' ability to maximize value in selling their inventory.

20.    The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the Sales and Store Closings, or institute any action against the Debtors in any court (other than this Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the conduct of the Sales and Store Closings or the advertising and promotion (including through the posting of signs) of the Sales.

F.    **The Store Bonus Program**

21.    The Debtors seek authorization to implement a store bonus program (the "**Store Bonus Program**") and make payments thereunder to Store Bonus Program participants, none of whom are insiders, to ensure successful consummation of the Store Closings. Specifically, the Debtors request the authority, at their discretion, to provide additional compensation in the form of bonuses to incentivize store-level employees to complete the Sales and Store Closings.  For the avoidance of doubt, to the extent Sales and Store Closings at certain Stores commenced pre-

petition, the Debtors seek authority to pay any accrued but unpaid amounts under the Store

Bonus Program when such amounts become due and owing.

22.     The Debtors and the Consultant have worked with the Debtors' financial advisor,

Berkeley Research Group, LLC ("**BRG**") to construct the Store Bonus Program, which is

designed to balance employee expectations based on the Debtors' past practices with standard

industry practices in retail chapter 11 cases.  Specifically, the Store Bonus Program consists of

the following policies:

> a.     The Consultant has proposed and the Debtors seek to pay "key managers" approximately $75.00 per week during the Sale Term.  This amount is not tied to sales achieved at the Stores.  In addition to the foregoing, unionized "key managers" will receive the severance payments due to them under their respective union agreements.

> b.     The Debtors seek to pay non-unionized "asset sales managers" approximately 23% of their yearly salaries and non-unionized "managers" approximately 26% of their yearly salaries over the course of the Sale Term.  Based on the anticipated length of the Sale Term, this amount equals approximately 4% and approximately 5%, respectively, of the eligible employees' yearly salaries.  Although these percentages are greater than those originally proposed by the Consultant, the Consultant, the Debtors, and BRG agreed that these bonuses are reasonable in light of the relatively small overall cost of this program (estimated as approximately $870,000) as well as eligible employees' expectations based on the Debtors' past practice.  The "manager" and "asset sale manager" bonuses will be based 50% on whether an employee's store meets certain defined sales thresholds and 50% on whether that employee remains with the Debtors through (i) his or her termination or (ii) the closing of his or her store, whichever is earlier.  This structure was conceived by the Consultant and is typical for similar chapter 11 debtors.

23.     The success of the Store Closings depends on store-level employees continuing

their ordinary course duties under the supervision of the Consultant and Debtors. Store

employees are necessary to, among other things, service customers, administer in-store sales, and

manage cash receipts and bank deposits. Replacing such employees would be unfeasible under

the contemplated timeframe for the Store Closings. Through the employees' ongoing

commitment and performance, the Debtors can ensure that they maximize estate value through the Sales and Store Closings. The Store Bonus Program is a necessary component of the Sales and Store Closings and has the support of the Debtors' pre-petition secured lenders and equity holders.

## IV.    RELIEF REQUESTED

24.    The Debtors seek entry of interim and final orders (respectively, the "**Interim Order**" and "**Final Order**"): (a) authorizing them to assume the Consulting Agreement; (b) authorizing them to conduct Sales and Store Closings at the Stores in accordance with the Store Closing Procedures, with such Sales to be free and clear of all liens, claims, and encumbrances; (c) approving the proposed Dispute Resolution Procedures described herein to resolve any disputes with governmental units regarding certain applicable non-bankruptcy laws that regulate liquidation and similar-themed sales; and (d) approving the implementation of the Store Bonus Program and authorizing payments thereunder to certain non-insider employees, including, for the avoidance of doubt, any payments that accrued but remain unpaid as of the Petition Date.

## V.    BASIS FOR THE RELIEF REQUESTED

## A.    The Court Should Authorize the Assumption of the Consulting Agreement.

25.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g.*, *In re Nickels Midway Pier, LLC,* 341 B.R. 486, 493 (Bankr. D.N.J. 2006) (finding that "a bankruptcy court should defer to a debtor's decision that rejection of a contract would be advantageous unless the

decision is so unreasonable that it could not be based on sound business judgment.") (*rev'd on other grounds by In re Nickels Midway Pier, LLC,* 341 B.R. 486 (D.N.J. 2006); *In re HQ Glob. Holdings. Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that debtor's decision to assume or reject an executory contract is governed by the business judgment standard and it can only be overturned if the decision was a product of bad faith, whim, or caprice); *see also In re Market Square Inn. Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of lease "will be a matter of business judgment").

26.    The business judgment test requires only that the debtor "establish that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp, v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987); *Nickels Midway Pier,* 341 B.R. at 493. Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank,* 762 F.2d 1303, 1311 (5th Cir. 1985).

27.    The assumption of the Consulting Agreement is beneficial to the Debtors' estates, and, therefore, is a reasonable exercise of the Debtors' business judgment. In consultation with their advisors, the Debtors have determined that the Store Closure Assets should be liquidated for the benefit of the Debtors' estates and their creditors. The Debtors determined that entering into the Consulting Agreement, after engaging in extensive negotiations with the Consultant, will provide the greatest return to the Debtors' estates for the Store Closure Assets. The Debtors believe that the terms set forth in the Consulting Agreement comprise the best terms available for the conduct of the Sales and Store Closings.

55008/0002-19576748v2

28.     The Consultant has extensive expertise in conducting liquidation sales and can oversee and assist in the management and implementation of the Sales and Store Closings in an efficient and cost-effective manner. Assumption of the Consulting Agreement will enable the Debtors to utilize the skills and resources of the Consultant to effectively and efficiently conduct the Sales and Store Closings for the benefit of all stakeholders. Given the number of Stores and the particular issues in administering the Sales and Store Closings, as discussed above, it is not certain the Debtors could retain a liquidator able to conduct the process as efficiently and effectively as the Consultant. If the Consulting Agreement is not approved of on an interim basis, the Sales and Store Closings would lose the benefit of the Consultant's oversight and might be delayed or suspended entirely, leading to loss of additional liquidity and increased administrative expenses. Moreover, it is imperative that the Consulting Agreement be approved on an interim basis so that the Debtors and Consultant can immediately begin to advertise the Sales as "Store Closing", "Everything Must Go", "Everything on Sale" "Going out of Business" or similarly themed Sales. Based on the Consultant's experience, the ability to advertise using this language will generate the most proceeds for the Debtors and their estates.

**B.      The Debtors Have a Valid Business Justification for the Sales.**

29.     Section 363(b)(1) of the Bankruptcy Code, which governs asset sales outside of the ordinary course of business, provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." When selling assets outside of the ordinary course of business, a debtor must articulate a valid business justification to obtain court approval. *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citation omitted); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp,* and requiring good faith); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1070-71 (2d Cir. 1983); *In re Delaware & Hudson Ry, Co.*, 124 B.R. 169, 175-76 (D. Del. 1991)

(concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts*

*Dairies* decision). When a debtor demonstrates a valid business justification for a decision, a

strong presumption arises "that in making [the] business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res.,*

*Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (holding that the Delaware

business judgment rule has "vitality by analogy" in Chapter 11, especially where the debtor is a

Delaware corporation (quotations omitted)).

30.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases

involving retail debtors. *See Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992)

(noting that liquidation sales are an important part of "overriding federal policy requiring [a]

Debtor to maximize estate assets"). As such, bankruptcy courts in the Third Circuit have

approved similar store closing sales. *See, e.g.*, *In re C. Wonder LLC,* No. 15-11127, (MBK)

(Bankr. D.N.J. Jan. 26, 2015); *In re SFP Franchise Corp.*, Case No. 20-10134 (JTD) (Bankr. D.

Del. Feb. 14, 2020); *In re Destination Maternity Corp.*, Case No. 19-12256 (BLS) (Bankr. D.

Del. Nov. 14, 2019); *In re Charming Charlie Holdings Inc.*, Case No. 17-12906 (CSS) (Bankr.

D. Del. Aug. 14, 2019); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9,

2019); *In re Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019);

*In re General Wireless Operations Inc. dba Radioshack, Inc.*, Case No. 17-10506 (Bankr. D.

Del. Apr. 10, 2017).

31.     Sufficient business justification exists to approve the proposed Sales under section

363(b)(1). The Debtors, with the assistance of their advisors, have determined that the Sales

represent the best alternative to maximize recoveries to the Debtors' estates with respect to the

Store Closure Assets. There are meaningful amounts of Merchandise, in the aggregate, that will

be monetized most efficiently and quickly through an orderly process conducted in consultation

with the Consultant, an experienced liquidating firm. Further, delay in commencing the Sales

would diminish the recovery tied to monetization of the Store Closure Assets. The Debtors will

realize an immediate benefit in terms of financial liquidity upon the sale of the Store Closure

Assets and the termination of operations at the Stores. Further, uninterrupted and orderly Sales

will allow the Debtors to timely reject leases associated with the Stores which are unlikely to be

assumed and assigned and, therefore, avoid the accrual of unnecessary administrative expenses

for rent and related costs. Suspension of the Sales until entry of the Final Order may cause the

Debtors to incur large, unnecessary claims for rent at many of these Stores, which the Debtors

may be required to pay in full.

**C.**      **The Debtors Have a Valid Business Justification for the Store Bonus Program.**

33.      Under the circumstances of these chapter 11 cases, the implementation of the

Store Bonus Program is a sound exercise of the Debtors' business judgment and is in the best

interests of the Debtors and all their estates' stakeholders. The Debtors believe the Store Bonus

Program is necessary to sustain employee morale and facilitate the Sales and Store Closings

during these chapter 11 cases. Absent the Store Bonus Program, the Debtors are likely to lose

key store personnel that are critical to administering final sales of merchandise.

33.      The flight risk of store employees is particularly acute in these chapter 11 cases

since the Debtors' stores are located in areas with numerous other retail tenants. Store employees

could simply pursue another retail opportunity within the same area if not offered an incentive to

stay with the Debtors. Such departures would jeopardize the Store Closing process by requiring

the Debtors to find new employees and train them to conduct the in-store functions necessary to

effectuate the Store Closing Sales. The Store Bonus Program is designed to mitigate flight risk

by incentivizing and rewarding store employees for staying with the Debtors through the Store

Closing process.

34.    If the Debtors are not able to keep their store employees and motivate them

through the Store Closings, the Debtors will realize less value to the detriment of their creditors.

The potential loss to the estate if employees are not retained through the Store Closing process

far outweighs the cost of the Store Bonus Program, which is reasonable in light of competitive

market practices. The maximum cost of the Store Bonus Program will be approximately 1% of

gross annual payroll for store employees and is similar to the amounts used in other restructuring

situations to incentivize employees to continue optimal performance despite the added stress

inherent in the chapter 11 process. *See, e.g.*, *In re Things Remembered, Inc.*, No. 19-10234 (KG)

(Bankr. D. Del. Feb. 6, 2019) (authorizing store closing bonuses up to l.0% of gross annual

payroll for closing stores); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del.

Feb. 7, 2018) (authorizing discretionary bonus payments in an amount no more than 10 percent

of payroll for store employees); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) (Bankr.

D. Del. Oct. 13, 2016) (authorizing store closing bonuses up to l.5% of gross annual payroll for

closing stores); *In re Quicksilver, Inc.*, No. 15-11880 (BLS) (Bankr. D. Del. Sept. 10, 2015)

(approving store closing bonuses up to 10% of base payroll for all employees working at the

closing stores); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb.20, 2015)

(same).

35.    The Store Bonus Program is comparable to employee incentive plans regularly

paid as "expenses of sale" by liquidating agents in other "store closing" and similar-themed

sales. As such, courts have approved incentive payments similar to those contemplated in the

Store Bonus Program. *See, e.g., In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D.

Del. Feb. 28, 2019) (authorizing store closing retention bonus program on a final basis); *In Bon-*

*Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 7, 2018) (authorizing store closing

retention bonus program on an interim basis); *In re Rue21, Inc.*, No. 17-22045 (GLT) Bankr.

W.D. Pa. June 12, 2017) (authorizing store closing retention bonus program on a final basis); *In*

*re Goldsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) Bankr. D. Del. Oct. 13, 2016) (same); *In*

*re Sport Auth. Holdings, Inc.*, No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (same).

36.    Accordingly, the Debtors submit that the relief requested with respect to the Store

Bonus Program is a valid exercise of the Debtors' business judgement and the approval of the

Store Bonus Program, including the payment of any amounts that accrued but were unpaid as of

the Petition Date, is appropriate under section 363 of the Bankruptcy Code and is the best

interests of the Debtors, their estates, and all parties-in-interest in these chapter 11 cases.

**D.**    **The Court Should Approve the Sale of the Store Closure Assets Free and Clear of all Liens, Encumbrances, and Other Interests under Bankruptcy Code Section 363(f).**

37.    The Debtors request approval to sell the Store Closure Assets on a final "as is"

basis, free and clear of any and all liens, claims, and encumbrances in accordance with section

363(f) of the Bankruptcy Code. A debtor in possession may sell property under sections 363(b)

and 363(f) "free and clear of any interest in such property of an entity other than the estate" if

any one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits sale

of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien

and the price at which such property is to be sold is greater than the aggregate value of all liens

on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled,

in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. §

363(f); *see also In re E. Orange Gen. Hosp.,* 587 B.R. 53, 77 (D.N.J. 2018) (noting that section

363(f) imposes five conditions, at least one of which must be satisfied for a sale free and clear).

Moreover, the Third Circuit has indicated that a debtor possesses broad authority to sell assets

free and clear of liens. *See In re TWA Inc.*, 322 F.3d 283, 289-90 (3d Cir. 2003).

38.     Although the term "any interest" is not defined in the Bankruptcy Code, the Third

Circuit has noted that the trend in modern cases is toward "a broader interpretation which

includes other obligations that may flow from ownership of the property." *Folger Adam Security,*

*Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000). As the Fourth Circuit held

in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581–82 (4th Cir. 1996) (cited with approval by

the Third Circuit in *Folger Adam)*, the scope of section 363(f) is not limited to *in rem* interests in

a debtor's assets. Thus, a debtor can sell its assets under section 363(f) "free and clear of

successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209

F.3d at 258.

39.     With respect to any other party asserting a lien, claim, or encumbrance against the

Store Closure Assets, the Debtors anticipate that they will be able to satisfy one or more of the

conditions set forth in section 363(f). In connection with the sale of the Store Closure Assets, the

Debtors propose that any liens, claims, and encumbrances asserted against the Store Closure

Assets be transferred to and attach to the amounts earned by the Debtors under the Sales with the

same force, effect, and priority as such liens currently have on the Store Closure Assets.

**E.      The Court Should Waive Compliance with Liquidation Sale Laws and Approve the**
**Dispute Resolution Procedures.**

40.     The Debtors' ability to conduct the Sales in accordance with the Store Closing

Procedures and without strict compliance with all Liquidation Sale Laws is critical to the Sales'

success. Although the Debtors intend to comply with state and local health and safety laws and

consumer protection laws in conducting the Sales, many Liquidation Sale Laws require special

55008/0002-19576748v2

and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales. Additionally, compliance with Fast Pay Laws would require the Debtors to pay terminated employees within a time frame that would be detrimental to the conduct of these chapter 11 cases, if not impossible.

41.    To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Liquidation Sale Laws, the Debtors propose the Store Closing Procedures as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sale Laws that may apply to the Store Closings. As such, the Debtors believe the Store Closing Procedures mitigate any concerns that their landlords or governmental agencies may raise with respect to the Store Closings and, therefore, the requested relief is in compliance with any applicable Liquidation Sale Laws.

42.    The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sale Laws. *First,* certain state statutes and regulations provide that, if a liquidation or bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sale Laws. *See, e.g.*, N.Y. Gen. Bus. Law § 584(a) (exempting "[p]ersons acting pursuant to an order or process of a court of competent jurisdiction" from New York State's regime on going out of business sales). *Second*, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Sales and Store Closings to proceed notwithstanding contrary Liquidation Sale Laws as it is essential to the continued operation of the Debtors' business. *Third*, this Court will be able to supervise the Sales and Store Closings because the Debtors and their assets are subject to this Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334. As such, creditors and the public interest are adequately protected by notice of

this motion and the ongoing jurisdiction and supervision of the Court because the Debtors are only seeking interim relief at the outset of these cases, and parties-in-interest will be able to raise any further issues at the final hearing.

43.      Further, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Grp. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [] cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).

44.      Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that the Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure). However, preemption is appropriate where, as here, the state laws involved concern economic regulation rather than the protection of public health and safety. *See In re Baker & Drake. Inc.*, 35 F.3d at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").

45.      Under the circumstances of these chapter 11 cases, enforcing the strict requirements of the Liquidation Sale Laws would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefit of creditors. Accordingly, authorizing the Sales and Store Closings without

55008/0002-19576748v2

the delays and burdens associated with obtaining various state and local licenses, observing state

and local waiting periods or time limits, and/or satisfying any additional requirements with

respect to advertising and similar items is necessary and appropriate. The Debtors do not seek a

general waiver of all state and local law requirements, but only those that apply specifically to

retail liquidation sales. Indeed, the requested waiver is narrowly tailored to facilitate the

successful consummation of the Sales and Store Closings. Moreover, the Debtors will comply

with applicable state and local public health and safety laws, and applicable tax, labor,

employment, environmental, and consumer protection laws, including consumer laws regulating

deceptive practices and false advertising.

46.     Finally, the Dispute Resolution Procedures provide an orderly means for resolving

any disputes arising between the Debtors and/or the Consultant and any Governmental Units or

Dispute Notice Parties with respect to the applicability of any Liquidation Sale Laws and should

therefore be approved.

47.     Further, courts have recognized that the Bankruptcy Code preempts certain state

laws and have granted relief similar to that requested herein. *See, e.g.*, *In re SFP Franchise

Corp.*, Case No. 20-10134 (JTD) (Bankr. D. Del. Feb. 14, 2020) (authorizing debtors to conduct

store closing sales under the terms of the order, which included a provision that "no further

approval, license, or permit of any Governmental Unit shall be required"); *In re Destination

Maternity Corp.*, Case No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (same);

*In re Charming Charlie Holdings Inc.*, Case No. 17-12906 (CSS) (Bankr. D. Del. Aug. 14, 2019)

(same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re

Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (same); *In re

General Wireless Operations Inc. dba Radioshack, Inc.*, Case No. 17-10506 (Bankr. D. Del. Apr.

10, 2017) (ordering that "[n]either the Debtors nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit . . . to conduct the Store Closing Sales and to take the related actions authorized herein).

48.     Courts have also granted similar relief from Fast Pay Laws in other bankruptcy cases under similar circumstances. *See, e.g.*, *In re SFP Franchise Corp.*, Case No. 20-10134 (JTD) (Bankr. D. Del. Feb. 14, 2020) (ordering that "[t]he Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided,* that the Debtors shall pay any accrued wages to terminated employees by the end of the second pay period following termination"); *In re Destination Maternity Corp.*, Case No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (ordering that "[t]he Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided,* that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible"); *In re Charming Charlie Holdings Inc.*, Case No. 17-12906 (CSS) (Bankr. D. Del. Aug. 14, 2019) (ordering that "[t]he Debtors shall not be required to comply with any state or local law requiring that the Debtors pay an employee substantially contemporaneously with his or her termination; *provided, however*, that the Debtors shall pay any accrued wages to terminated employees as expeditiously as possible"); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 28, 2019) (same).

F.     **The Court Should Waive Compliance with Any Restriction in the Leases.**

49.     Certain of the Debtors' leases governing the Debtors' tenancy at the Stores may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing,

liquidation, or similar sales. Such provisions have been held to be unenforceable in chapter 11

cases as they constitute an impermissible restraint on a debtor's ability to properly administer its

reorganization case and maximize the value of its assets under section 363 of the Bankruptcy

Code. *See Ames Dep't Stores*, 136 B.R. at 359 (deciding that enforcement of such lease

restrictions would "contravene overriding federal policy requiring debtor to maximize estate

assets. . . ."); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73–74 (Bankr. S.D.N.Y. 1994)

(holding that the lessor could not recover damages for breach of a covenant to remain open

throughout the lease term, because the debtor had a duty to maximize the value to the estate and

the debtor fulfilled this obligation by holding a store closing sale and closing the store); *In re

Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's

efforts to reorganize would be significantly impaired to the detriment of creditors if lease

provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops,

Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable

in chapter 11 case where debtor sought to conduct a liquidation sale).

50.     Court have held that restrictive lease provisions affecting store liquidation sales in

chapter 11 cases are unenforceable. *See, e.g.*, *In re Coldwater Creek*, No. 14-10867 (BLS)

(Bankr. D. Del. May 7, 2014) (ordering that store closing sales be conducted without the further

need for compliance with, among other things, lease provisions); *In re Boscov's*, No. 08¬11637

(KG) (Bankr. D. Del. Aug. 15, 2008) (same); *In re Goody's Family Clothing, Inc.*, No. 08-11133

(CSS) (Bankr. D. Del. June 13, 2008) (same); *In re Linens Holding Co.*, No. 0810832 (CSS)

(Bankr. D. Del. May 30, 2008) (same).

51.     Thus, to the extent that such provisions or restrictions exist in any of the Debtors'

Store leases, the Debtors request that the Court authorize the Debtors and/or the Consultant to

conduct the Sales and Store Closings without reference to any such restrictive provisions or

interference by any landlords or other persons affected, directly or indirectly, by the Sales.

**G.    The Court Should Approve the Abandonment of Certain Property in Connection with Any Liquidation Sales.**

52.    After notice and a hearing, a debtor "may abandon any property of the estate that

is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11

U.S.C. §554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974)

(stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems

less valuable than the cost of asserting that claim").

53.    The Debtors are seeking to sell all FF&E remaining in the Stores. However, the

Debtors may determine that the costs associated with holding or selling certain property or FF&E

exceeds the proceeds that will be realized upon its sale or that such property is not sellable at all.

In such event, the property is of inconsequential value and benefit to the estates and/or may be

burdensome to retain.

54.    To maximize the value of the Debtors' assets and to minimize the costs to the

estates, the Debtors respectfully request authority to abandon, after consultation with the pre-

petition lenders, any of remaining FF&E or other property located at any of the Stores without

incurring liability to any person or entity in accordance with the terms of the Consulting

Agreement. The Debtors further request that the landlords of each Store at which FF&E or other

property is abandoned be authorized to dispose of such property without liability to any third

parties.

55.    Notwithstanding the foregoing, the Debtors will utilize all commercially

reasonable efforts to remove or cause to be removed any confidential or personal identifying

information (which means information that, alone or in conjunction with other information,

identifies an individual, including, but not limited to, an individual's name, social security

number, date of birth, government-issued identification number, account number, and credit or

debit card number) in any of the Debtors' hardware, software, computers, cash registers, or

similar equipment that is to be sold or abandoned.

**H.  The Court Should Find That Any Sale of the Store Closure Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman.**

56.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or

release personally identifiable information about individuals unless such sale or lease is

consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to

section 332 of the Bankruptcy Code. The Debtors will not be selling or releasing personally

identifiable information in the course of the Sales. Therefore, appointment of a consumer privacy

ombudsman is unnecessary.

## VI.     RESERVATION OF RIGHTS

57.     Except with respect to the Consultant and the Consulting Agreement, nothing

contained herein is intended or should be construed as: (a) an admission as to the validity,

priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or

any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise

or requirement to pay any particular claim; (d) an implication or admission that any particular

claim is of a type specified or defined in this motion; (e) a request or authorization to assume any

agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or

limitation of the Debtors' or any other party-in-interest's rights under the Bankruptcy Code or

any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that

any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this motion

are valid and the Debtors and all other parties-in-interest expressly reserve their rights to

contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court

grants the relief sought herein, any payment made pursuant to the Court's order is not intended

and should not be construed as an admission as to the validity, priority, or amount of any

particular claim or a waiver of the Debtors' or any other party-in-interest's rights to

subsequently dispute such claim.

## VII.    BANKRUPTCY RULE 6003 HAS BEEN SATISFIED

58.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid

immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to

use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a

motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one

(21) days after filing of the petition. Fed. R. Bankr. P. 6003(b).  For the reasons discussed above,

authorizing the Debtors to assume the Consulting Agreement, approving Store Closing or similar

themed Sales in accordance with the Store Closing Procedures, and granting the other relief

requested herein is integral to the Debtors' ability to transition their operations into these chapter

11 cases smoothly and maximize the value of their assets. Failure to receive such authorization

and other relief during the first 21 days of these chapter 11 cases would severely disrupt the

Debtors' operations at this critical juncture and deprive the estates of value. For the reasons

discussed herein, the relief requested is necessary in order for the Debtors to maximize the value

of their estates for the benefit of their estates, creditors, and all parties-in-interest. Accordingly,

the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of

Bankruptcy Rule 6003 to support granting the relief requested herein.

55008/0002-19576748v2

## VIII.  REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

59.    To implement the foregoing successfully, the Debtors request a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by

Bankruptcy Rule 6004(h), to the extent such stay applies.

## IX.    NO PRIOR REQUEST

60.    No prior request for the relief sought herein has been made to this Court or any

other court.

## X.    NOTICE

61.    Notice of this Motion has been provided to (i) the Office of the United States

Trustee for Region 3; (ii) the holders of the twenty (20) largest unsecured claims against the

Debtors (on a consolidated basis); (iii) counsel for the administrative agent under the Debtors'

pre-petition revolving credit facility, JPMorgan Chase Bank, N.A., c/o Daniel F. Fiorillo, Esq.

and Chad B. Simon, Esq., Otterbourg P.C.; (iv) counsel for the term agent under the Debtors'

pre-petition term loan, Wells Fargo Bank, National Association, c/o Steven E. Fox, Esq., Riemer

& Braunstein LLP; (v) the Internal Revenue Service; (vi) the United States Attorney's Office for

the District of New Jersey; (vii) the Consultant; and (vii) the landlords at the Stores. The Debtors

submit that, in view of the facts and circumstances, such notice is sufficient and no other or

further notice need be provided.

32

WHEREFORE the Debtors respectfully request entry of the proposed interim and final orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: March 11, 2020

Respectfully submitted,

**COLE SCHOTZ P.C.**
*Proposed Attorneys for Debtors
and Debtors in Possession*

 */s/ Michael D. Sirota*
Michael D. Sirota
David M. Bass
Felice R. Yudkin
Court Plaza North
25 Main Street
Hackensack, NJ 07601
Telephone:  (201) 489-3000
Facsimile:  (201) 489-1536
Email: msirota@coleschotz.com
        dbass@coleschotz.com
        fyudkin@coleschotz.com