**COLE SCHOTZ P.C.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
msirota@coleschotz.com
David M. Bass, Esq.
dbass@coleschotz.com
Felice R. Yudkin, Esq.
fyudkin@coleschotz.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| MODELL'S SPORTING GOODS, INC., *et al.,* Debtors.[1] | Case No. 20-14179 (VFP) |
| | Joint Administration Requested |

### DECLARATION OF ROBERT J. DUFFY
### IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS
### AND FIRST DAY MOTIONS

I, Robert J. Duffy, make this declaration under 28 U.S.C. § 1746:

1.       Although employed by Berkeley Research Group, LLC ("**BRG**"), I have been

engaged by Modell's Sporting Goods, Inc. ("**MSGI**") and its subsidiaries, the debtors and

debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), to

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal tax identification number, as applicable, are as follows: Modell's Sporting Goods, Inc. (9418), Modell's II, Inc. (9422), Modell's NY II, Inc. (9434), Modell's NJ II, Inc. (9438), Modell's PA II, Inc. (9426), Modell's Maryland II, Inc. (9437), Modell's VA II, Inc. (9428), Modell's DE II, Inc. (9423), Modell's DC II, Inc. (9417), Modell's CT II, Inc. (7556), MSG Licensing, Inc. (8971), Modell's NH, Inc. (4219), Modell's Massachusetts, Inc. (6965) and Modell's Online, Inc. (2893).  The Debtors' corporate headquarters is located at 498 Seventh Avenue, 20th Floor, New York, New York 10018.

serve as Chief Restructuring Officer ("**CRO**") of the Debtors.  I have been the Debtors' CRO

since January 29, 2020 .  In or about June 2017, BRG was first retained by the Debtors to

provide certain financial advisory and consulting services.  On or about June 28, 2019 and again

in January 2020, BRG was re-engaged by the Debtors to provide similar advisory services.  In

connection with providing those services and, later, in performing my role as CRO, I have

become familiar with the Debtors' day-to-day operations, business and financial affairs, books

and records, and the circumstances leading to the commencement of the Debtors' chapter 11

cases (the "**Chapter 11 Cases**").

2.      I am a Managing Director, Practice Leader and member of the Board of Directors

of BRG, a global consulting firm.  BRG's Corporate Finance practice consists of senior

financial, management consulting, accounting, and other professionals who specialize in

providing financial, business, and strategic assistance, frequently in situations involving under

performing and distressed businesses. Professionals employed at BRG have experience working

with debtor companies and secured and unsecured creditors, equity holders, and other parties in

both in-court and out-of-court engagements.

3.      I have over thirty (30) years of experience in the restructuring industry serving as

an advisor to private equity firms, corporations, lenders, and boards of directors of

underperforming businesses and companies in transition.  I specialize in performance

improvement and restructuring, which has involved leading companies and their stakeholders

through transformation efforts.  My prior experiences have included serving in interim

management positions, including assessing business line profitability, operational analysis,

liquidity and capital structure assessment and working capital management in situations similar

to this one.

2

4.      Before joining BRG in 2016, I spent fourteen (14) years at FTI Consulting, Inc. ("**FTI**") and fourteen (14) years at PricewaterhouseCoopers.  Most recently before joining BRG, I was the Global Practice Leader of the FTI Consulting Corporate Finance/Restructuring practice having joined FTI following its 2002 acquisition of the restructuring practice at PricewaterhouseCoopers.  I have an undergraduate degree from Babson College and an MBA degree from the Kellogg Graduate School of Management at Northwestern University.  Among other organizations, I have been active in American Bankruptcy Institute, Turnaround Management Association, and Association of Insolvency Accountants.  I am a fellow of the American College of Bankruptcy.

5.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of New Jersey (the "**Court**"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      To enable the Debtors to operate effectively and minimize potential adverse effects in the Chapter 11 Cases, the Debtors have requested certain relief in "first day" motions and applications filed with the Court (collectively, the "**First Day Motions**") concurrently herewith.   The First Day Motions, summarized below, seek, among other things, to (a) ensure the continuation of the Debtors' cash management system and other business operations without interruption, (b) allow the Debtors to continue using cash collateral, (c) preserve the Debtors' valuable relationships with suppliers, customers, and other interested parties, (d) permit the Debtors to continue to sell their goods in the ordinary course of business, (e) maintain employee morale and confidence and (f) implement certain administrative procedures that will promote a

3

seamless transition into chapter 11.  This relief is critical to the Debtors' efforts to maximize value of the benefit of their creditors.

7.      This Declaration is submitted in support of the First Day Motions.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the retail industry.  I am authorized to submit this Declaration on the Debtors' behalf.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

8.      This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for their restructuring pursuant to chapter 11 of the Bankruptcy Code. Sections I and II provide a brief overview of the Debtors' businesses and the Debtors' contemplated course of action.  Section III describes the Debtors' pre-petition capital structure. Section IV describes the circumstances that precipitated the commencement of the Chapter 11 Cases and the Debtors' objectives in the Chapter 11 Cases.  Section V provides a summary of the First Day Motions and the factual bases for the relief requested therein.

## I.      **PRELIMINARY STATEMENT**

9.      The Debtors are America's oldest family-owned and operated retailer of sporting goods, athletic footwear, active apparel, and licensed fan gear operating under the Modell's Sporting Goods brand.  Well known for its slogan "Gotta go to Mo's", the retail chain was founded by Morris A. Modell in 1889 as a single store on Cortland Street in lower Manhattan. Four generations of the Modell family developed the family business from a New York-based retailer to a sporting goods powerhouse with an omni-channel footprint.



10.     The Debtors currently own and operate 134 brick-and-mortar stores[2] located in various strip centers and regional malls throughout the Northeastern and mid-Atlantic United States as well as online through their e-commerce site, Modells.com.  The Debtors offer a broad selection of goods from the most respected brands in the industry including Nike, Under Armour, Adidas, Champion, Rawlings, Converse, Asics, New Balance, Skechers, Timberland, and Wilson.  The Debtors also sell Smith's branded merchandise pursuant to a license agreement. The Debtors' target customers include athletes, sports fans, and fitness enthusiasts.

11.     The Debtors' business operations, like those of many of their peers in the sporting goods retail space, have been negatively impacted by adverse market trends, including the shifting of sales from traditional brick-and-mortar retailers to online resellers, increased competition from big-box and specialty sporting goods retailers, decline in sports team participation among youth and teens and changing consumer preferences.   The industry-wide weakness in the Debtors' business segments is reflected by the bankruptcy filings of several of the Debtors' competitors over the last several years including Sports Authority, Sport Chalet, City Sports, MC Sports, and Eastern Mountain Sports.

---

[2] Two (2) of the Debtors' store leases are in the name of HMC (defined below).  The Debtors, however, operate and own the inventory within those stores.

12.     As set forth herein, the Debtors' short-term financial performance has also been adversely affected by, among other things, (i) warm winter weather in the Northeastern states, which negatively affected the sales of cold-weather goods and items and overall store traffic, (ii) lower-than-anticipated sales of licensed goods in the fourth quarter of 2019[3] based on local professional team performance and (iii) inventory flow disruption during the first half of 2019 due to rumors surrounding the financial stability of the business.  The operating losses suffered as a consequence of these issues further impaired the Debtors' liquidity.

13.     Against that backdrop, before the Petition Date, the Debtors and their advisors worked diligently to solicit and develop strategic alternatives to maximize value for the benefit of all stakeholders.  In that regard, the Debtors' Chief Executive Officer, Mitchell Modell, negotiated tirelessly with vendors and landlords on the terms of an out-of-court restructuring. Over the course of several weeks, Mr. Modell undertook herculean efforts to obtain rent concessions from the Debtors' landlords and more favorable credit terms from the Debtors' trade vendors.  Unfortunately, given the Debtors' limited runway, the Debtors were unable to execute on any such out-of-court restructuring.

14.     At the same time the Debtors were exploring their out-of-court options for increasing liquidity, the Debtors pursued other alternatives to maximize value for their stakeholders.  To that end, the Debtors engaged (i) RBC Capital Markets ("**RBC**"), as investment banker to market the Debtors for sale as a going concern, (ii) Tiger Capital Group, LLC ("**Tiger**"), as consultant to conduct store closing sales and (iii) A&G Realty Partners, LLC as real estate advisor.

---

[3] The Debtors' fiscal year ends on the Saturday closest to January 31st.  The fiscal year for 2018 ended on February 2, 2019.

15.    The Debtors, through RBC, launched an accelerated marketing process in late January.  In the weeks leading up to the Petition Date, the Debtors engaged in significant negotiations with a potential acquisition partner (the "**Potential Bidder**") for the acquisition of certain of the Debtors' assets as a going concern.  However, on March 10, 2020, the Debtors and the Potential Bidder reached an impasse in those negotiations and, given the lack of other interested parties and the Debtors' tightening liquidity, it became clear that the pursuit of a going concern sale was no longer viable.

16.    In parallel with the negotiations with the Potential Bidder, the Debtors worked closely with their advisors, including Tiger, to right-size their store footprint by closing underperforming locations.  That effort began on February 21, 2020, with the commencement of store closing sales at nineteen (19) locations.  Immediately after determining that a going concern sale to the Potential Bidder was no longer a feasible path, the Debtors determined that commencing store closing sales at all their locations is the best course of action.

17.    In an ever-shifting retail climate that has seen numerous casualties over the last several years, the Debtors commenced these Chapter 11 Cases to preserve value for the benefit of the Debtors' stakeholders.  The Debtors determined that filing for Chapter 11 protection, utilizing cash collateral (with the consent of their lenders) and pursuing an orderly liquidation of their assets in a controlled, court-supervised environment is the best available option to maximize value for the benefit of all stakeholders.  The Debtors believe that the Chapter 11 process, including the proposed liquidation of substantially all their assets, will provide greatest recovery for their creditors.

## II.   THE DEBTORS' BUSINESS

### A.   Corporate Structure

18.     MSGI is a privately held company wholly owned by Mitchell B. Modell.  MSGI,

in turn, directly owns all of the equity in the following  subsidiaries, each of which is a Debtor:

(a) Modell's II, Inc. ("**Modell's II**"); (b) Modell's NY II, Inc.; (c) Modell's NJ II, Inc.; (d)

Modell's PA II, Inc.; (e) Modell's Maryland II, Inc.; (f) Modell's VA II, Inc.; (g) Modell's DE II,

Inc.; (h) Modell's DC II, Inc.; (i) Modell's CT II, Inc.; (j) MSG Licensing, Inc.; (k) Modell's

NH, Inc.; (l) Modell's Massachusetts, Inc.; and (m) Modell's Online, Inc.  An organizational

chart illustrating the corporate structure of the Debtors is attached hereto as **Exhibit A**.  Each of

the Debtors is a qualified subchapter S corporation.

19.     The Board of Directors of MSGI is composed of Mitchell B. Modell and Bernard

A. Katz, an independent director.

### B.   The Debtors' Business Operations

20.     The Debtors are full-line sporting goods retailers.  As of the Petition Date, the

Debtors operate 134 stores, with 33 stores in New Jersey.  The Debtors' merchandise is broadly

classified into four (4) different departments: (1) apparel; (2) licensed team products; (3)

footwear and (4) sporting goods.   Apparel has been the Debtors' largest department and growth

driver since 2010, constituting 46% of the Debtors' total sales in 2019.



21.    The Debtors maintain a supply chain comprised of more than 250 vendors that is designed to ensure the uninterrupted flow of new merchandise to their brick-and-mortar locations and to their e-commerce customers.  The Debtors' greatest expense is its merchandise, which expense totals approximately $225 million annually.  The Debtors' profitability is highly dependent on maintaining strong relationships and favorable trade terms with their key suppliers.

22.    The Debtors do not manufacture any merchandise and rely upon their vendors, shippers, and warehousemen to ensure a continuous supply of goods to their customers. Specifically, the Debtors lease a distribution center in the Bronx section of New York to process merchandise and warehouse inventory and to support the Debtors' stores and e-commerce platform.  The Debtors lease trucks which are used to deliver merchandise from the distribution center to all of the Debtors' retail locations other than those in the Mid-Atlantic region.  The Debtors outsource the shipment of merchandise from the distribution center to their Mid-Atlantic retail locations through a third-party shipper.

23.    Most of the Debtors' stores are located in strip malls and shopping malls throughout the Northeastern United States.  The Debtors do not own any real estate.  Instead, they lease their store locations, corporate offices, and distribution center under operating leases that expire on various dates through 2033.  The Debtors' rental expenses total approximately $95 million per year.

24.    The Debtors currently employ approximately 3,623 employees, comprised of approximately 341 full-time employees and 3,282 hourly employees.  The Debtors' store and distribution center employees are members of the Union Local 1102 RWDSU UFCW and RWDSU Local 108. The employees serve in many capacities supporting the Debtors' operations at the corporate office, their distribution center, or at their retail stores.

25.     For the fiscal year ending February 2020, the Debtors had gross sales totaling approximately $490 million.  As of the Petition Date, the Debtors' balance sheet reflects approximately $220 million in assets and approximately $288 million in liabilities.

## C.     The Debtors' Relationship with HMC

26.     The Debtors' business evolved from the retail business originally created through non-debtor Henry Modell & Company, Inc. ("**HMC**").  As of the Petition Date, HMC, a non-debtor, operates six (6) stores under the trade name "Modell's Sporting Goods" pursuant to a license agreement with the Debtors.

27.     The Debtors and HMC have a long-standing relationship which has historically been governed by a Services Agreement dated April 3, 2011 (the "**Shared Services Agreement**").  In order to operate its stores, HMC required the provision of certain services by MSGI and Modell's II necessary for the operation, administration, programming, merchandising, marketing, staffing, managing, and operation of the HMC retail stores and Modell's II provides paymaster services to HMC.  The services MSGI and Modell's II provided to HMC were allocated and billed to HMC as contemplated by the Shared Services Agreement.

28.     As of the Petition Date, the Debtors' books and records reflect an obligation of approximately $40 million due and owing from MSGI to HMC.  Shortly before the Petition Date, the Debtors requested payment of approximately $1.9 million pursuant to the Shared Services Agreement.  Additionally, $5.3 million was due and owing to the Debtors for inventory sold to HMC.  HMC did not remit payment and instead, HMC asserted a partial setoff against the inter-company debt.  MSG and HMC have entered into a series of short-term agreements to allow Modell's II employees to continue working in HMC stores at HMC's expense.

10

## III.    CAPITAL STRUCTURE

### A.    Pre-Petition Secured Debt

29.    The Debtors are parties to that certain the Credit Agreement, dated June 30, 2011 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Credit Agreement**" and collectively with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, or otherwise modified in accordance with the terms thereof, the "**Loan Documents**"), by and among the Debtors, JPMorgan Chase Bank, N.A., in its capacities as administrative agent and co-collateral agent (in such capacities, "**Prepetition Administrative Agent**") and issuing bank (in such capacity, "**Issuing Bank**"), Wells Fargo Bank, National Association, as term agent and co-collateral agent ("**Prepetition Term Agent**"), and the lenders party thereto from time to time (the "**Prepetition Lenders**", together with the Prepetition Administrative Agent, the Prepetition Term Agent, and the Issuing Bank, collectively, the "**Prepetition Credit Parties**"), the Prepetition Credit Parties made loans, advances and provided other financial accommodations to the Debtors.  As of the Petition Date, the Debtors were jointly and severally indebted and liable to the Prepetition Credit Parties under the Loan Documents in an aggregate principal amount not less than (i) $29,560,711 the Prepetition Administrative Agent on account of revolving loans, plus (ii) $9,225,000 to the Prepetition Term Agent on account a term loan, plus (iii) additional amounts arising from and relating to letters of credit in the aggregate undrawn face amount of $4,576,208.97 plus (iv) all interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and all other Obligations accrued, accruing or chargeable in respect thereof or in addition thereto, (collectively, the "**Prepetition Obligations**" and together with any Obligations arising, accrued, accruing, due, owing or

11

chargeable on or after the Petition Date in accordance with the Loan Documents, this Interim

Order and any Final Order and, together with the Prepetition Obligations, the "**Obligations**").

30.    In connection with the Credit Agreement, the Debtors entered into that certain

Amended and Restated Security Agreement, dated as of October 16, 2018 (as amended from

time to time prior to the Petition Date, the "**Security Agreement**"), by and between the Debtors,

as Grantors, and the Prepetition Administrative Agent.  Pursuant to the Security Agreement and

other Loan Documents, each Debtor granted senior liens upon and security interests in

substantially all of such Debtors' assets (the "**Prepetition Collateral**") to the Prepetition

Administrative Agent for the benefit of itself and the other Prepetition Credit Parties as security

for the Obligations.  The Prepetition Administrative Agent and M and M Lending LLC (the

"**Prepetition Subordinated Creditor**") are parties to that certain Subordination Agreement

dated as of June 3, 2019 which, among other things, confirms the senior priority of the security

interests of Prepetition Administrative Agent in the assets and properties of Debtors to the

interests of Prepetition Subordinated.

**B.      General Unsecured Creditors**

31.    As of the Petition Date, the Debtors believe that unsecured claims against the

Debtors are in excess of $100 million.   Unsecured claims against the Debtors include (i) accrued

and unpaid trade and other unsecured debt incurred in the ordinary course of the Debtors'

business, (ii) unpaid amounts owed to the Debtors' vendors, (iii) claims for unpaid rent and other

obligations under the Debtors' leases and (iv) amounts due and owing under the $6.8 million

loan from the Prepetition Subordinated Creditor (described below).  The Debtors are also jointly

liable with HMC to make quarterly contributions to a pension plan which is underfunded by

approximately $25.8 million.  As leases are rejected during the Chapter 11 Cases, the number of

unsecured claims will increase significantly.

## IV.    THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS COMPELLING THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    Diminished Operating Performance

32.    The Debtors, like many other retail companies, have faced a challenging commercial environment over the past several years.  The Debtors' challenges have been exacerbated by increased competition from big-box and specialty sporting goods retailers, declining participation in team sports among youth and teens and a shift in customer preferences away from physical retail stores and toward online-only stores.  Given the Debtors' substantial brick-and-mortar presence, their business has been heavily dependent on in-store traffic, which has declined in recent years.  The Debtors' financial condition is weighed down by a store footprint that is disproportionate to market demands.

33.    Complicating matters further, the Northeastern states where the Debtors operate experienced warmer weather than expected in December 2019 and January 2020, which caused a decrease in cold-weather apparel and footwear sales.

34.    The success of regional sports teams also significantly influences the Debtors' sales.  For example, the Philadelphia Eagles Super Bowl victory led to strong financial performance in the fourth quarter of 2017.  For fiscal years 2018 and 2019, however, the Debtors' sales declined given the lack of success of regional sports teams.

### B.    Trade Contraction in Early 2019

35.    The lifeline of the Debtors' business is their access to and relationships with their network of suppliers.  The Debtors' ability to generate income is wholly dependent on sales.  If the quality of the Debtors' inventory decreases, sales do as well.  In early 2019, many of the Debtors' key vendors reacted to rumors surrounding the Debtors' financial stability and demanded modification of the terms on which they delivered goods to the Debtors, including

reduced payment schedules or cash in advance and reduced customary trade credit to the Debtors.

36.     As a result, in early 2019, the Debtors suffered a disruption in the flow of inventory which deprived their stores of needed merchandise for several months.  The delayed access to goods negatively affected the Debtors' financial performance.

**C.**     **Lack of Capital to Complete Necessary Capital Improvements to Move the Debtors' Distribution Center.**

37.     Historically, the Debtors leased their Bronx, New York distribution center from M&M Service Center, LLC ("**M&M Service**"), an affiliated entity.  In or about December 2018, M&M Service sold the distribution center to an unrelated third party and the Debtors entered into a new lease for the distribution center effective December 21, 2018.  Pursuant that lease, the Debtors must vacate the distribution center on or before December 28, 2020.

38.     In view of the need to vacate the distribution center by the close of 2020, the Debtors began to prepare for the move by signing a lease for a new distribution center.  The Debtors estimate, however, it will cost approximately $22 million to move and equip the distribution center with the necessary systems to effectively operate.  Given the Debtors' current operational performance, the Debtors do not have the resources to undertake that move.

**D.**     **Landlord and Vendor Issues**

39.     Due to insufficient liquidity, the Debtors did not pay February or March rent on most of their stores and significantly curtailed payments to the majority of their vendors, suppliers, service providers and other trade creditors.  As a result, several vendors and suppliers have begun holding deliveries of merchandise.

40.      Moreover, shortly after non-payment of February rent, the Debtors began receiving notices of default from landlords.  After the contractual cure periods expire, certain

14

landlords may be able to lock the Debtors out from their stores.  Such a result would be value

destructive, preventing the Debtors from monetizing their inventory, even in stores that may be

subject to closing.  While certain landlords agreed to forestall remedies, there exists the constant

overhang of lessors exercising remedies in the near term.

**E.**      **The Debtors' Consideration of Strategic Alternatives**

41.      Over the last several years, the Debtors have undertaken a number of steps to

improve their operational performance and reduce costs including improved gross margin

performance, restructured leases, closure of several unprofitable stores and an overall reduction

in expenses. .

42.      In October 2018, the Debtors gained access to a term loan from the Prepetition

Term Agent to ensure that the Debtors had, among other things, sufficient liquidity to maintain

operations.  The Debtors' negative operating performance in November and December of 2018,

however, resulted in a drain on liquidity, including the term loan that the Debtors had hoped

would be available for future use.

43.      By the beginning of 2019, it became clear that, due to the Debtors' liquidity

constraints, the Debtors required a long-term solution to their financial distress and determined

that their best options were to either inject new capital into the company or effectuate a sale of

some or all of their assets.   In connection with their exploration of alternatives, in January 2019,

the Debtors retained RBC as their investment banker to explore a potential sale of the Debtors'

assets.  In early 2019, RBC contacted twenty-five (25) strategic and financial buyers, had

executed confidentiality agreements with fourteen (14) buyers and had conducted eight (8)

management presentations.

44.      On or about June 4, 2019, the Prepetition Subordinated Creditor, an entity wholly

owned by Mitchell B. Modell, loaned the Debtors $6.8 million.  Additionally, in early 2019, the

Debtors obtained rent deferrals, re-negotiated many of the store leases and secured improved payment terms from many vendors.  As a result, all efforts to sell the Debtors' assets were suspended.

45.    As set forth above, during the course of fiscal year 2019, however, the Debtors continued to miss sales targets causing another strain on the Debtors' liquidity.  In January 2020, the Debtors retained BRG to again evaluate the Debtors' strategic alternatives.  In the weeks leading up to the Petition Date, the Prepetition Lenders increased discretionary reserves, further constraining already tightening liquidity.   By the Petition Date, the Prepetition Lenders had imposed incremental reserves of $18 million.  As a result, the Debtors' availability under the Credit Agreement was only $9.589 million and did not provide enough liquidity to continue to operate in the ordinary course of business.

46.    Recognizing the need to explore strategic alternatives, the Debtors worked with their advisors to evaluate solutions to the Debtors' deteriorating circumstances.  As set forth above, in the weeks leading to the Petition Date, the Debtors' Chief Executive Officer worked determinedly with vendors and landlords on an out-of-court restructuring.  While the Debtors were able to secure additional rent concessions from certain landlords, they lacked sufficient liquidity to execute on a business plan that would be acceptable to their vendors.

47.    At the end of January 2020, the Debtors and their advisors undertook another marketing process for the sale of the Debtors' business as a going concern.  On or about January 29, 2020, RBC again began reaching out to potential bidders.  RBC contacted a total of fourteen (14) strategic buyers, some of which who were also contacted in early 2019 .  The Debtors and their advisors worked quickly to enter into confidentiality agreements with interested parties and to provide access to their virtual data room. Before the Petition Date, the Debtors negotiated with

the Potential Bidder with respect to a going concern sale.  Those negotiations, however, were

ultimately unsuccessful and the Debtors immediately pivoted to an orderly liquidation of all their

assets.

48.    By moving expediently with the closing sales, the Debtors hope to maximize

overall recovery for the estates while minimizing their liabilities.  In addition to their store

closing sales, the Debtors intend to market and sell their locations as well as their intellectual

property.

**F.    Proposed Course of the Chapter 11 Cases**

49.    The Debtors believe, in the exercise of their business judgment, that the

liquidation will provide the best process under the circumstances to maximize value for their

stakeholders.  The Debtors will utilize cash collateral, having obtained consent of their

Prepetition Lenders.  Consensual use of cash collateral will provide the Debtors with sufficient

liquidity to operate during the liquidating process, with revenue from the store closing sales

projected to be sufficient to support continued operations and the administrative expenses of the

Chapter 11 Cases, as well as reduce the balance owed to the Prepetition Lenders.

## V.    FIRST DAY MOTIONS

50.    To minimize the adverse effects of the commencement of these Chapter 11 Cases

on the Debtors' ability to effectuate a timely and efficient Chapter 11 liquidation that will

maximize value of the Debtors' estates, the Debtors have filed a number of First Day Motions

designed to facilitate their transition into Chapter 11.

51.    I anticipate that the Court will conduct a hearing soon after the Petition Date at

which the Court will hear and consider many of the First Day Motions.  Many of the First Day

Motions seek authority to pay certain pre-petition claims.  I understand that Rule 6003 of the

Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not

consider motions to pay pre-petition claims during the first twenty-one days following the filing

of a chapter 11 petition, "[e]xcept to the extent that relief is necessary to avoid immediate and

irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests

for immediate authority to pay pre-petition claims to instances where the failure to pay such

claims would cause immediate and irreparable harm to themselves and their estates.  Other relief

will be deferred for consideration at a later hearing.

52.     I have reviewed each of the First Day Motions with the Debtors' counsel and the

facts stated therein are true and correct to the best of my knowledge, information, and belief.  I

believe that the relief sought in each of the First Day Motions is tailored to meet the goals

described above, is necessary and critical to the Debtors' liquidation efforts, and is in the best

interests of the Debtors' estates and creditors.  A detailed discussion of the facts supporting and

the relief requested in each of the First Day Motions is included in the attached **Exhibit B**.  I

hereby adopt and affirm the factual representations contained in each of the First Day Motions.

## VI.    CONCLUSION

53.     This declaration describes the factors that have precipitated the commencement of

the Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief

sought in the First Day Motions.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 11th day of March, 2020

_____

ROBERT J. DUFFY
CHIEF RESTRUCTURING OFFICER

55008/0002-14622845

**Exhibit A**

**Corporate Organizational Chart**

Corporate Organizational Chart
## Modell's Sporting Goods, Inc.



\* MSGI owns all issued shares of each of its subsidiary.  All issued shares are common stock.

## Exhibit B

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

### Administrative and Procedural First Day Motions

**A.     Debtors' Application for Expedited Consideration of First Day Matters**

1.     The Debtors request entry of an Order granting expedited consideration of their
First Day Motions.  I believe that the relief requested in this application is essential to avoid any
disruption the commencement of these Chapter 11 Cases may have on the Debtors, will facilitate
the Debtors' orderly transition into Chapter 11, and will preserve the value of the Debtors'
assets.  Accordingly, I respectfully submit that the Debtors' request for expedited consideration
of the First Day Motions be approved.

**B.     Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of an Order
     Directing Joint Administration of the Debtors' Chapter 11 Cases**

2.     The Debtors request entry of an order jointly administering these Chapter 11
Cases for procedural purposes only and request that the Court instruct the Clerk of Court to make
an entry on each Debtor's docket reflecting the joint administration of these Chapter 11 Cases.
Each of the Debtors is "affiliated" with the others as defined by section 101(2) of the Bankruptcy
Code.  Joint administration of these cases will avoid the unnecessary time and expense of
drafting, filing, and serving duplicative motions, applications, orders, and other papers and
related notices in each case.  Moreover, joint administration will relieve this Court of the burden
of entering duplicative orders and maintaining duplicative dockets and files and will ease the
burden on the U.S. Trustee in supervising these cases.  The Debtors also request authority to file
the monthly operating reports on a consolidated basis in the lead Debtor's case.  I respectfully

---

[1] Capitalized terms used but not defined in this Exhibit B have the meanings ascribed to them in the First
Day Declaration and their respective First Day Motions.

2

submit that joint administration will save considerable time and expense for all parties-in-interest

and this Court and the relief requested should be granted.

**C.**     **Debtors' Application for Designation as Complex Chapter 11 Cases**

3.     The Debtors request entry of an order designating the Debtors' Chapter 11 Cases

as complex cases pursuant to the Court's General Order Governing Procedures for Complex

Chapter 11 Cases, dated November 25, 2009.  These Chapter 11 Cases qualify as complex

chapter 11 cases because (a) the Debtors collectively have total liabilities of approximately $288

million; (b) the Debtors collectively have total assets of approximately $220 million; and (c) the

Debtors collectively have more than 11,000 potential creditors, including employees and

vendors. These Chapter 11 Cases would be administered most efficiently as complex chapter 11

cases.  I believe that the relief requested in the application will enable the Debtors to continue to

operate their businesses in a streamlined fashion and allow the U.S. Trustee and other parties-in-

interest to monitor these Chapter 11 Cases with greater ease and efficiency.  Accordingly, I

respectfully submit that the Debtors' cases should be designated complex cases.

**D.**     **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 521(a)(1)(b) and Fed. R.
Bankr. P. 1007(c) for Entry of an Order Extending Time to File Their Schedules of
Assets and Liabilities and Statements of Financial Affairs**

4.     The Debtors request entry of an order granting a thirty-day extension of the time

to file their Schedules and Statements for a total of forty-four days after the Petition Date without

prejudice their right to request additional time.  Preparing the Schedules and Statements will

require the Debtors' employees and professionals to devote substantial time and effort to

analyzing the Debtors' various constituencies on an entity-by-entity basis.  Given the size and

complexity of their operations, the Debtors anticipate that they will be unable to complete their

Schedules in the fourteen days provided under Bankruptcy Rule 1007(c) and that it would be

unnecessarily burdensome to attempt to do so during the first fourteen days of these Chapter 11

Cases. I believe that the extension requested is in the best interests of the Debtors' estates, creditors, and all parties-in-interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, I respectfully submit that the Court should grant the Debtors' motion seeking an extension of time in which to file their Schedules and Statements.

**E.**      **Debtors' Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) for Entry of an Order Authorizing the Appointment of Prime Clerk LLC as Claims and Noticing Agent Nunc *Pro Tunc* to the Petition Date**

5.      The Debtors seek entry of an Order appointing Prime Clerk as claims and noticing agent in these Chapter 11 Cases because it has significant experience in both the legal and administrative aspects of large, complex chapter 11 cases and its professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.  I believe that Prime Clerk's appointment is the most effective and efficient manner of noticing creditors and parties-in-interest of the filing of and developments in these cases.  In addition, Prime Clerk will transmit, receive, docket and maintain proofs of claim filed in connection with these cases. Accordingly, I believe that the appointment of Prime Clerk to act as an agent of this Court is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtors' motion to appoint Prime Clerk.[2]

---

[2]  The Debtors intend to file a subsequent application to retain Prime Clerk to perform certain administrative services under section 327 of the Bankruptcy Code.

4

**F.**    **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(A) and 521, and Fed. R. Bankr. P. 1007(A) and 2002(A) and (F), for Entry of an Order Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors and (C) Mail Initial Notices**

6.     The Debtors seek entry of an order authorizing them to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, to file a consolidated list of their top 20 creditors, and to mail initial notices.  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be burdensome, result in duplicate mailings, and could increase the risk of errors in translating the Debtors' computerized information into a .txt mailing matrix.  Separately, filing a single consolidated list of the Debtors' combined 20 largest unsecured creditors in these Chapter 11 Cases would be more reflective of the unsecured creditor body than filing separate lists for each of the Debtors.  Finally, to alleviate the administrative and economic burdens that these Chapter 11 Cases may impose upon the Court and the Clerk's office, the Debtors propose that Prime Clerk undertake all mailings directed by this Court or the U.S. Trustee or required by the Bankruptcy Code or Bankruptcy Rules.  Prime Clerk will, among other things, serve the notice of commencement of these Chapter 11 Cases, thus ensuring that all creditors and parties-in-interest receive timely and proper notice of filing of the Debtors' petitions as well as the date, time, and location for the first meeting of creditors pursuant to section 341 of the Bankruptcy Code.  In sum, I respectfully submit that the Court should grant the relief requested in this motion in order to alleviate unnecessary administrative burdens during the course of these Chapter 11 Cases.

55008/0002-19921866v2

## Operational First Day Pleadings

**A.**    **Debtors' Application for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing (I) the Retention of Berkeley Research Group, LLC and (II) the Designation of Robert J. Duffy as Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Date**

7.       The Debtors seek entry of an order authorizing them to (i) retain and employ BRG and (ii) designate me as CRO *nunc pro tunc* to the Petition Date pursuant to the terms of the January 29, 2020 Engagement Agreement between and among the Debtors and BRG.  As set forth in detail in the declaration I submitted in support of that application, both BRG and I have considerable experience working with complex retail businesses like the Debtors' in a variety of in- and out-of-court restructuring scenarios.  Additionally, BRG's prior experience working with the Debtors also makes it uniquely suited to serve them in these Chapter 11 Cases.  Accordingly, I believe that retention of BRG as the Debtors' financial advisor and designation of myself as the Debtors' CRO is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and respectfully submit that the Court should grant the Debtors' motion and the requested relief.

**B.**    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief (the "Cash Collateral Motion")**

8.       By way of the Cash Collateral Motion, the Debtors seek entry of an order authorizing them to use cash collateral of their lenders.  In order to ensure they have sufficient funds to maintain the stability of their business throughout the completion of the store closing sales, the Debtors intend to use the Cash Collateral, with the consent of their lenders, in accordance with the terms of a budget that reflects the financial needs of the Debtors over the course of the chapter 11 cases.  In exchange for the use of their Cash Collateral, the Debtors intend to grant adequate protection to the lenders as set forth in more detail in the Cash Collateral

6

Motion.  The proposed Adequate Protection package provides the lenders with a variety of

safeguards to protect against any diminution (if any) in the value of the cash collateral.

9.      Absent approval of the use of cash collateral on the terms set forth in the Interim

Order, the Debtors will not have sufficient liquidity to maintain their day-to-day operations, fund

employee payroll and benefit obligations, and satisfy other working capital and operational

requirements during these chapter 11 cases.  Thus, without immediate access to Cash Collateral,

the Debtors would be required to cease operations resulting in a substantial loss of value to the

detriment of all parties-in-interest.

10.     Based on the foregoing, I believe the relief requested in the Cash Collateral

Motion is critical to the preservation of value while the Debtors pursue an orderly liquidation.

**C.      Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363 for Entry of Interim and
Final Orders (I) Approving Modified Cash Management System, (II) Authorizing
the Debtors to Continue Using Existing Bank Accounts and Business Forms, and
(III) Authorizing the Debtors to Continue Intercompany Transactions (the "Cash
Management Motion")**

11.     In the Cash Management Motion, the Debtors request interim and final authority

to (i) modify their existing cash management system, (ii) continue maintenance of their existing

Bank Accounts and Business Forms, (iii) implement changes to their Cash Management System

in the ordinary course of business, including, without limitation, opening new or closing existing

Bank Accounts, and (iv) continue to perform under and honor Intercompany Transactions in the

ordinary course of business, in their business judgment and at their sole discretion.

12.     The Debtors use an integrated, centralized Cash Management System to collect,

concentrate, and disburse funds generated by their operations.  Although aspects of the Debtors'

Cash Management System have changed from those adhered to in the pre-petition period, the

central cash concentration and cash disbursement mechanisms thereof remain unchanged.  The

Cash Management System is tailored to meet the Debtors' operating needs as the operator of 134

retail stores.  The Cash Management System enables the Debtors to efficiently collect and

disburse cash generated by their businesses, pay their financial obligations, centrally control and

monitor corporate funds and available cash, comply with the requirements of their financing

agreements, reduce administrative expenses, and efficiently obtain accurate account balances and

other financial data.  The Debtors' Finance Department oversees the Cash Management System

and the Debtors maintain records of all transactions processed through their Cash Management

System.  Although some of the Cash Management System is automated, Finance Department

personnel monitor the Bank Accounts and manage the collection and disbursement of funds.

13.     Among other things, the Cash Management System facilitates the Debtors'

business relationships with each other, which result in intercompany receivables and payables

referred to as Intercompany Claims.  The primary Intercompany Transactions giving rise to

Intercompany Claims among the Debtors are:

(a)     Cash Receipts Activities.  The Main Operating Account is owned by
Modell's II.  To the extent the revenue in the Main Operating Account is
cash from another Debtor entity, an Intercompany Transaction is recorded
by Modell's II as an intercompany payable due to that Debtor.

(b)     Disbursement Activities.  Any disbursement made from the Main
Operating Account on behalf of another Debtor gives rise to an
intercompany receivable owed to Modell's II by the other Debtor.

(c)     Expense Allocations.  In the ordinary course of business, the Debtors incur
centrally-billed expenses, including insurance premiums, workers'
compensation obligations, payroll and benefit costs, general corporate
services, and information technology costs.  Modell's II pays these
expenses, thereby creating Intercompany Claims that are reflected on the
relevant Debtors' balance sheets.

14.     Intercompany Claims are not settled by actual transfers of cash among the

Debtors.  The Debtors track all Intercompany Transactions electronically in their accounting

system and concurrently record such transactions on the applicable Debtors' balance sheets,

which are regularly reconciled.  As part of the monthly closing process, journal entries are

created to enter an intercompany receivable on one Debtor's balance sheet and a corresponding

intercompany payable on the applicable affiliate's balance sheet.  This results in a net balance of

zero when accumulating all intercompany accounts.  During these Chapter 11 Cases, the Debtors

will keep records of any post-petition Intercompany Transactions.

15.    I believe the relief requested in the Cash Management Motion is in the best

interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the

Debtors to continue to operate their business in these Chapter 11 Cases with minimal disruption.

Most significantly, maintaining the Cash Management System in its current state is crucial to the

Debtors' continued operations, given the significant number of cash transactions processed

through the Cash Management System each day.  Any disruption to the Cash Management

System would significantly hinder the Debtors' day-to-day operations and impede the successful

administration of their estates.  In light of the foregoing, and for the reasons set forth in the Cash

Management Motion, I respectfully submit that the Cash Management Motion should be granted.

Absent the relief requested in the Cash Management Motion, the Debtors and their estate would

suffer immediate and irreparable harm.

**D.**    **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a), and 541 for Entry
of an Order Authorizing, But Not Directing, the Debtors to Pay Certain Pre-Petition
Taxes and Fees (the "Tax Motion")**

16.    In the Tax Motion, the Debtors request entry of interim and final orders

authorizing, but not directing, the payment of Sales and Use Taxes, in the ordinary course of

business and without regard to whether such obligations accrued or arose before or after the

Petition Date.

17.    In the ordinary course of business, the Debtors collect, withhold, or incur an

assortment of state and local Sales and Use Taxes and remit same to various state and local

taxing Authorities when due.  The pre-petition Sales and Use Taxes are not property of the

55008/0002-19921866v2

Debtors' estates but, rather, are held in trust for the Authorities.  The Debtors seek to pay the pre-petition Sales and Use Taxes in order to, among other things, prevent the Authorities from taking actions that might interfere with the Debtors' administration of Chapter 11 Cases, which may include bringing personal liability actions against the Debtors' directors, officers, and other key employees (whose full-time attention to the Debtors' Chapter 11 Cases is required to avoid business disruptions and maximize recoveries to the Debtors' creditors) or assessing penalties and/or significant interest on past-due taxes.  In addition, non-payment of the Sales and Use Taxes may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, the Debtors submit that the proposed relief is in the best interest of their estates.

18.    Although the Debtors believe they are current with respect to their payment of Sales and Use Taxes, the Debtors estimate that, as of the Petition Date, they have collected or incurred approximately $1,200,000 in pre-petition Sales and Use Taxes that have not yet been remitted to the appropriate Authorities.  The Debtors estimate that approximately $800,000 in pre-petition Sales and Use Taxes will become due and payable within twenty-one (21) days following the Petition Date.

19.    The Debtors must continue to pay the Sales and Use Taxes to continue their business and avoid costly distractions during the Chapter 11 Cases.  The failure to pay the Sales and Use Taxes could adversely affect the Debtors' business operations.  In addition, certain Authorities may take precipitous action against the Debtors' officers and directors for unpaid Sales and Use Taxes, which undoubtedly would distract those key individuals from their duties. For the reasons set forth herein and in the Tax Motion, I respectfully submit that the relief requested in the Tax Motion is in the best interest of the Debtors' estates and creditors.  Absent

10

the relief requested in the Tax Motion, the Debtors and their estates could suffer immediate and

irreparable harm.

E.    **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363, and 507(a) for Interim and Final Authority to (I) Pay Certain Pre-Petition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefits Programs, and for Related Relief (the "Wages Motion")**

20.    In the Wages Motion, the Debtors seek entry of interim and final orders

authorizing, but not directing, them to (i) pay certain pre-petition wages and reimbursable

employee expenses, (ii) pay and honor employee medical and other benefits, and (iii) continue

employee benefit programs and other related relief.

21.    The Debtors employ approximately 3,623 Employees, including approximately

341 full-time Salaried Employees and 3,282 Hourly Employees.  In addition, the Debtors

currently are utilizing five Temporary Employees.  All the Employees are employed through

debtor Modell's II.  The vast majority of the Debtors' Hourly Employees are unionized through

either Local 1102 RWDSU UFCW or Local 108 RWDSU.

22.    The Debtors' Employees are the lifeblood of their business; their value cannot be

overstated.  The Employees perform critical functions, including sales, customer service,

information technology, purchasing, administrative, legal, accounting, finance, and management-

related tasks.  Their skills and experience, as well as their relationships with customers and

vendors and knowledge of the Debtors' infrastructure, are essential to the Debtors' ongoing

operations and ability to effectively operate their businesses during these Chapter 11 Cases.

23.    Accordingly, through the Wages Motion, the Debtors request authority to pay and

honor certain pre-petition claims and obligations, continue programs, and maintain funding, in

the exercise of their discretion, relating to, among other things: (i) Unpaid Compensation,

Deductions, Payroll Maintenance Fees, Workforce Management Fees, and Payroll Taxes;

11

(ii) Incentive Plans; (iii) Reimbursable Expenses; (iv) Employee Benefit Programs; (v) the

401(k) Savings Plan; (vi) Pension Obligations; and (vii) the Severance Programs.  The relief

requested in the Wages Motion is necessary for the Debtors to be able to maintain morale,

continue to service the needs of their customers, and preserve creditor confidence in their

continued operations.

24.    Absent the relief sought in the Wages Motion, the Debtors' Employees may seek

alternative opportunities, perhaps with the Debtors' competitors.  The loss of valuable

Employees would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet

their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability

to successfully preserve going-concern value.  Moreover, I believe the Debtors' failure to satisfy

Employee Obligations would jeopardize Employee morale and loyalty at a time when Employee

support is most critical to the Debtors' businesses, particularly during the current store

optimization and restructuring period.  Increased instability in the Debtors' workforce will

undermine the Debtors' ability to complete the store closing sales that are critical to generating

immediate liquidity.

25.    The majority of the Debtors' Employees rely exclusively on their compensation

and benefits to satisfy their daily living expenses.  These Employees would be exposed to

significant financial difficulties and other distractions if the Debtors are not permitted to honor

their obligations for unpaid compensation, benefits, and reimbursable expenses.  Furthermore, if

the Court does not authorize the Debtors to honor their various obligations under the insurance

programs, the Employees may not receive health coverage and, thus, may become obligated to

pay certain health care claims in the absence of insurance coverage.  The loss of health insurance

would result in considerable anxiety for Employees (and likely lead to attrition) at a time when

the Debtors need such Employees to perform their jobs at peak efficiency.  Additionally, as

noted above, Employee attrition would cause the Debtors to incur additional expenses to find

appropriate and experienced replacements, severely disrupting the Debtors' operations at a

critical juncture.

26.     Accordingly, for the reasons set forth herein and in the Wages Motion, I

respectfully submit that the relief requested in the Wages Motion is necessary and critical to the

Debtors' ability to preserve value for the benefit of the Debtors' estates, their creditors, and all

parties-in-interest, and will enable the Debtors to continue to operate their businesses in these

Chapter 11 Cases within minimal disruption, thereby maximizing the value for the estates.

Absent the relief sought in the Wages Motion, the Debtors and their estates would suffer

immediate and irreparable harm.

**F.**     **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) for Interim
And final Authority to (I) Maintain, Renew, and Continue Their Insurance Policies
and Programs and (II) Honor All Insurance Obligations (the "Insurance Motion")**

27.     In the Insurance Motion, the Debtors seek entry of an order authorizing, but not

directing, them to (i) continue to maintain, renew, and continue their Insurance Policies and

Programs and honor their Insurance Obligations in the ordinary course of business during the

administration of these Chapter 11 Cases and (ii) pay any pre-petition Insurance Obligations,

including, without limitation, amounts owed to the Insurance Service Providers.

28.     The Debtors' Insurance Policies and Programs are essential to the preservation of

value of the Debtors' businesses, leasehold estates, and assets.  I understand that, in many

instances, the insurance coverage provided by the Insurance Policies and Programs, including the

Workers' Compensation Programs, is required by the various regulations, laws, and contracts

that govern the Debtors' commercial activities as well as by the Bankruptcy Code and the U.S.

13

Trustee. Accordingly, failure to honor the Insurance Obligations could have a significant negative impact on the Debtors' operations.

29.     The Debtors anticipate that up to $1,855,000 in Insurance Obligations will become due and owing within the first 21 days of these Chapter 11 Cases.

30.     The Insurance Policies and Programs are essential to preserving the value of the Debtors' business operations and assets. Accordingly, for the reasons set forth herein and in the Insurance Motion, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, and all parties-in-interest and will enable the Debtors to continue to operate their businesses and preserve the value of their estates. Absent the relief requested, the Debtors and their estates would suffer immediate and irreparable harm.

**G.      Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service the ("Utility Motion")**

31.     Pursuant to the Utilities Motion, the Debtors seek entry of an interim and final orders (i) approving the Debtors' proposed form of adequate assurance of payment to utility providers, (ii) establishing procedures for determining adequate assurance of payment for future utility services, and (iii) prohibiting utility providers from altering or discontinuing utility service on account of an outstanding prepetition invoice.

32.     In the ordinary course of their business, the Debtors receive utility services from various Utility Providers for, among other things, electricity, natural gas, water, and telecommunications services. The Utility Providers include, without limitation, the entities set forth on the Utility Service List, a copy of which is attached as Exhibit A to the Utility Motion. On average, the Debtors spend approximately $762,913.36 each month on utility costs. That

14

calculation includes amounts paid to certain of the Debtors' landlords who, in turn, are

responsible for paying the relevant utility companies.

33.     The Debtors intend to pay post-petition obligations owed to the Utility Providers

in a timely manner.  The Debtors expect that cash flows from operations will be sufficient to pay

post-petition utility obligations in the ordinary course of business.  Nevertheless, the Debtors

propose to deposit in the Adequate Assurance Account, within twenty (20) days following entry

of an interim order granting the Utility Motion, an Adequate Assurance Deposit for each Utility

Provider that the Debtors pay directly (less any amounts already on deposit with any such Utility

Provider that have not been applied to outstanding prepetition amounts), based on the Debtors'

average usage for the fiscal year ending 2019 .  As of the Petition Date, the Debtors estimate that

the Adequate Assurance Deposit will total approximately $336,703.06.

34.     Through the Utility Motion, the Debtors seek orders approving their Proposed

Adequate Assurance to Utility Providers as adequate within the meaning of section 366 of the

Bankruptcy Code and granting them authority to implement, and require Utility Providers to

comply with, the Proposed Adequate Assurance Procedures in connection therewith.  These

procedures will allow Utility Providers to request additional adequate assurance for unpaid utility

services if they believe the proposed amount is insufficient.

35.     Preserving utility services on an uninterrupted basis is essential to the Debtors'

operations.  Any interruption in utility services, however brief, would seriously disrupt the

Debtors' ability to continue operations and service their customers.  This disruption would

adversely impact customer relationships and would result in a decline in the Debtors' revenues.

Such a result could jeopardize the Debtors' efforts to maximize value for the benefit of their

creditors.  Therefore, it is critical that utility services continue uninterrupted during these Chapter

15

11 Cases.  I am advised that if the Adequate Assurance Procedures are not approved, the Debtors

may be (and I believe likely will be) confronted with and forced to address numerous requests by

their Utility Providers at a critical point in their Chapter 11 Cases.  Moreover, the Debtors could

be blindsided by a Utility Provider unilaterally deciding—on or after the 30th day following the

Petition Date—that it is not adequately protected and either making an exorbitant demand for

payment to continue service or electing to discontinue service to the Debtors altogether.  Such an

outcome could seriously jeopardize the Debtors' operations, asset values, and ability to

maximize recoveries to their stakeholders.

36.    Accordingly, for the reasons set forth herein and in the Utilities Motion, I

respectfully submit that the relief requested in the Utilities Motion is necessary and in the best

interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the

Debtors to continue to operate their business and to safeguard the value of their estates.

**H.**    **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(A), 363(B), 365 and 507(A) for
Interim and Final Authority to (I) Maintain and Administer Pre-Petition Customer
Programs, Promotions, and Practices, as Modified (II) Pay and Honor Related Pre-
Petition Obligations, and (III) Direct the Credit Card Processors to Honor the
Debtors' Credit Card Processing Agreement Pending Its Assumption or Rejection
(the "Customer Programs Motion")**

37.    In the Customer Programs Motion, the Debtors request authority, in the ordinary

course of business and consistent with past practice, to maintain, administer, pay, and otherwise

honor their pre-petition Customer Programs, as modified, and Processing Obligations, whether

arising prior to or after the Petition Date, as necessary and appropriate in the Debtors' business

judgment.  Additionally, pursuant to sections 365 and 105(a) of the Bankruptcy Code, the

Debtors request entry of an order directing the Payment Processing Company to honor the

Processing Agreement pending assumption or rejection.

(i)    **The Customer Programs.**

38.    The Debtors have historically offered various return and exchange policies, gift cards, and other practices and programs. The Customer Programs were standard in the retail industry, provided incentives to existing customers to shop with the Debtors, and attracted new customers to the Debtors' stores and website. The Customer Programs were designed to promote customer satisfaction and inure to the goodwill of the Debtors' businesses and the value of their brand. Although the Debtors intend to modify the Customer Programs post-petition, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases, through the completion of the liquidation, and is necessary to maximize the value of the Debtors' businesses for the benefit of the Debtors' estates, creditors, and all parties-in-interest. The Customer Programs include Return and Exchange Policies, a Gift Card Program, a loyalty program referred to as the MVP Program, and various Coupons and other Sales Promotions.

39.    The Debtors estimate that, as of the Petition Date, there are approximately $4.6 million in valid, outstanding obligations under the Gift Card Program and the MVP Program.[3] These obligations do not require the Debtors to expend any cash.

40.    I believe that continuing to honor the Customer Programs, as modified in the Customer Programs Motion, during the pendency of these Chapter 11 Cases is critical to preserving the value of the Debtors' assets by protecting the Debtors' valuable customer relationship and goodwill, all of which will inure to the benefit of the Debtors' estates, their creditors, and all parties-in-interest. In contrast, if the Debtors were unable to continue the Customer Programs, the Debtors would risk alienating their customers and could jeopardize their

---

[3] Although the Debtors historically honored expired MVP Program award certificates, the Debtors will not continue that practice post-petition as it would result in an additional $64 million liability.

ability to maximize value for their estates during the liquidation process.  In sum, I believe that the failure to honor the Customer Programs, as modified, could adversely impact the Debtors' store closing sales and corresponding value to their estates.

### (ii)    The Processing Obligations

41.    The majority of the Debtors' sales are made via Credit Card Payments and other Non-Cash Payments.  The Debtors rely on their Payment Processing Company to process such payments pursuant to a Payment Processing Agreement.  Although the Debtors are not aware of any outstanding pre-petition Processing Obligations under the Payment Processing Agreement, it is possible that certain Processing Obligations incurred by the Debtors immediately before the Petition Date may not have been fully netted out against the payments received by the Debtors before the Petition Date.  In order to avoid disrupting vital payment processing services, the Debtors (i) seek authority to continue to pay the Processing Obligations, including pre-petition Processing Obligations, in the ordinary course of their business, and (ii) request that the Court authorize the Payment Processing Company to offset the Processing Obligations against amounts remitted to the Debtors, in each case in the ordinary course, whether arising before or after the Petition Date.

42.    In order to effectuate a smooth transition into these Chapter 11 Cases, the Debtors must maintain customer loyalty and goodwill through the Customer Programs and must continue to honor their Processing Obligations.  The Customer Programs and the Debtors' relationship with the Payment Processing Company are essential to preserving the value of the Debtors' business operations pending a sale of their assets.  Accordingly, for the reasons set forth herein and in the Customer Programs Motion, I respectfully submit that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their business and to

18

safeguard the value of their estates.  Absent the relief requested in the Customer Programs

Motion, the Debtors and their estates would suffer immediate and irreparable harm.

**I.**     **Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 for Interim and Final Orders Authorizing the Debtors to Pay Pre-Petition Shipping Charges in the Ordinary Course of Business (the "Shippers' Motion")**

43.      In the Shippers' Motion, the Debtors request entry of interim and final orders

authorizing, but not directing, them to pay the Shipping Charges in the ordinary course of

business.

44.      The Debtors' businesses depend on the uninterrupted flow of Merchandise.  The

Debtors' engage Third-Party Shippers to transport Merchandise (i) to the Distribution Center,

(ii) from the Distribution Center to the Debtors' Stores in the Maryland, Virginia, and the

Washington, D.C. area, and (iii) directly to customers who purchase Merchandise online.  If the

Debtors fail to pay the Third-Party Shippers for charges incurred in connection with the

transportation of the Merchandise, various state laws may permit the Third-Party Shippers to

assert statutory liens against any Merchandise in their possession that is the subject of a

delinquent charge. If a Third-Party Shipper were to take such an action, it could prevent the

Debtors from accessing their Merchandise.

45.      The Debtors estimate that, as of the Petition Date, approximately $350,000 in pre-

petition Shipping Charges have accrued but have not yet become due and payable. The Debtors

estimate that approximately $750,000 in Shipping Charges will become due and payable within

twenty-one (21) days of the Petition Date.

46.      Maintaining access to the Merchandise and ensuring its orderly distribution is

critical to preserving the value thereof and to maximizing the value of the Debtors' businesses.

Accordingly, for the reasons set forth herein and in the Shippers' Motion, I respectfully submit

that the relief requested in the Shippers' Motion is in the best interests of the Debtors' estates,

their creditors, and all parties-in-interest and will enable the Debtors to continue to operate their

business and to safeguard the value of their estates.  Absent the relief requested in the Shippers'

Motion, the Debtors and their estates would suffer immediate and irreparable harm.

**J.**    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Approving the Implementation of Customary Store Bonus Program and Payments to Non-Insiders Thereunder (the "Store Closing Motion")**

47.    In the Store Closing Motion, the Debtors seek entry of interim and final orders

(a) authorizing them to assume the Consulting Agreement; (b) authorizing them to conduct Sales

and Store Closings at the Stores in accordance with the Store Closing Procedures, with such

Sales to be free and clear of all liens, claims, and encumbrances and; (c) approving the proposed

Dispute Resolution Procedures described herein to resolve any disputes with governmental units

regarding certain applicable non-bankruptcy laws that regulate liquidation and similar-themed

sales; and (d) approving the implementation of the Store Bonus Program and authorizing

payments thereunder to certain non-insider employees.

48.    The Debtors and their advisors seek authority to assume the Consulting

Agreement with Tiger Capital Group, LLC so that they may conduct Store Closing Sales, free

and clear of all liens, claims, and encumbrances, at the Stores. A copy of the Consulting

Agreement, as amended, is annexed as <u>Exhibit 1</u> to the proposed interim order granting the Store

Closing Motion and the salient terms thereof are summarized in the Store Closing Motion.  I

believe the assumption of the Consulting Agreement is in the best interests of the Debtors'

estates, their creditors, and all parties-in-interest in light of the Consultant's knowledge of the

Debtors' assets as well as its experience running similar store closing sales.  I believe the

Consultant will be able to maximize the value of the Store Closure Assets and expeditiously

conduct the Store Closing Sales so that the Debtors may assume, assume and assign, or reject their underlying leases as they see fit in the exercise of their business judgment.

49.      In connection with the Store Closing Motion, the Debtors also seek approval of streamlined Store Closing Procedures, as set forth in <u>Exhibit 2</u> to the proposed interim order granting the Store Closing Motion, to sell the Store Closure Assets free and clear of liens, claims, and encumbrances. The Debtors have determined, in the exercise of their business judgment and in consultation with their advisors, and I believe that the Store Closing Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize their value to the estates.

50.      In addition, the Debtors seek to implement the Store Bonus Program and make payments thereunder to store-level employees, none of whom are insiders, to ensure successful consummation of the Store Closings. The Debtors and the Consultant worked with BRG to construct the Store Bonus Program, which is designed to balance employee expectations based on the Debtors' past practices with standard industry practices in retail chapter 11 cases.  The success of the Store Closings depends on store-level employees continuing their ordinary course duties under the supervision of the Consultant and Debtors. Store employees are necessary to, among other things, service customers, administer in-store sales, and manage cash receipts and bank deposits. Replacing such employees would be unfeasible under the contemplated timeframe for the Store Closings. Through the employees' ongoing commitment and performance, the Debtors can maximize estate value through the Sales and Store Closings. The Store Bonus Program is a necessary component of the Sales and Store Closings and has the support of the Debtors' pre-petition secured lenders and equity holders.

51.     Finally, as set forth in the Store Closing Motion, subject to the Bankruptcy

Court's approval, the Debtors seek the following relief, which will empower the Debtors and the

Consultant to conduct the Store Closing Sales and maximize value for the Debtors' estates, their

creditors, and all parties-in-interest:

(a)     to the extent the Store Closing Procedures conflict with the Liquidation
        Sale Laws, authority to conduct the Store Closings in accordance with the
        Store Closing Procedures;

(b)     approval of the Dispute Resolution Procedures in order to facilitate the
        orderly resolution of any disputes between the Debtors and any
        Governmental Units arising due to the Store Closing Procedures and the
        alleged applicability of any Liquidation Sale Laws;

(c)     an exemption from any Fast Pay Laws that may apply to employees
        terminated in connection with the Store Closings;

(d)     a waiver of any contractual restrictions that could otherwise inhibit or
        prevent the Debtors from maximizing value for creditors through the Sales
        and Store Closings; and

(e)     an Order providing that no entity, including, without limitation, utilities,
        landlords, shopping center managers and personnel, creditors, and all
        persons acting for or on their behalf shall interfere with or otherwise
        impede the conduct of the Sales and Store Closings, or institute any action
        against the Debtors in any court (other than this Court) or before any
        administrative body that in any way directly or indirectly interferes with,
        obstructs, or otherwise impedes the conduct of the Sales and Store
        Closings or the advertising and promotion (including through the posting
        of signs) of the Sales.

52.     The Debtors have determined the Store Closings represent the best alternative to

maximize recoveries to the Debtors' estates with respect to the Stores.  The Debtors believe that

there are meaningful assets at the Stores that the Consultant will be able to monetize quickly and

efficiently and quickly through an orderly process.  In light of the foregoing, and for the reasons

set forth in the Store Closing Motion, I respectfully submit that the Store Closing Motion is in

the best interests of the Debtors' estates, their creditors, and all parties-in-interest and should be

granted.

**K.**  **Debtors' Motion for Entry of an Order Authorizing and Approving Procedures for Rejection of Executory Contracts and Unexpired Leases ("Lease Rejection Motion")**

53.    In the Lease Rejection Motion, the Debtors request authority to establish procedures to reject burdensome leases and executory contracts, in their business judgment and without further order of this Court.  The Rejection Procedures are set forth in detail in the Lease Rejection Motion.

54.    The Debtors believe that the Rejection Procedures will streamline their ability to reject burdensome executory Contracts and unexpired Leases that no longer provide a benefit to the Debtors' estates while also providing parties in interest with adequate notice of the rejection of Contracts and Leases and an opportunity to object to such relief within a reasonable time period.  Absent the relief requested herein, filing multiple motions for the rejection of each Contract and Lease would result in substantial costs to, and impose administrative burdens on, the Debtors' estates, in addition to the burden such approach would place on the Court's docket and calendar. As such, the proposed Rejection Procedures are appropriate and necessary to limit the costs and administrative burdens that otherwise would be borne by the Debtors' estates.

55.    In light of the foregoing, and for the reasons set forth in the Lease Rejection Motion, I respectfully submit that the Lease Rejection Motion should be granted.

55008/0002-19921866v2